982 P.2d 853

**ROBERT'S HAWAII SCHOOL BUS, INC.; and Student Transportation, Inc., Plaintiffs–Appellants,**

v.

**LAUPAHOEHOE TRANSPORTATION COMPANY, INC.; Central Transportation Company, Inc.; Double K Transportation Services, Inc.; T & N Transportation Services, Inc.; and Nobu Shinohara, as Personal Representative of the Estate of Chiaki Matsuo, Defendants–Appellees,**

and

**John Does 1–25**

and

**Doe Business Entities 26–50, Defendants.**

No. 19044.

Supreme Court of Hawai'i.

July 15, 1999.

Reconsideration Denied Sept. 1, 1999.

Paul Alston, David A. Nakashima, and Jade Lynne Holck, of Alston, Hunt, Floyd & Ing for Plaintiffs–Appellants Robert's Hawaii School Bus, Inc., and Student Transportation, Inc., on the briefs, Honolulu.

George W. Playdon, Jerrold K. Guben, and Ronald T. Ogomori, Honolulu, for Defendants–Appellees Laupahoehoe Transportation Company Inc., Central Transportation Company, Inc., Double K Transportation Services, Inc., and Nobu Shinohara, as Personal Representative of the Estate of Chiaki Matsuo

John Francis Perkins and Wayne S. Sakamoto for Defendant–Appellee T & N Transportation Services, Inc.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

The instant appeal arises from the procurement of public school buses for 1991 to 1998 by the School Bus Transportation Branch of the State of Hawai'i Department of Accounting and General Services (DAGS).

Plaintiffs-appellants Robert's Hawaii School Bus, Inc. (RHSB) and Student Transportation, Inc. (STI) [1] filed a complaint, on April 8, 1993, against defendants-appellees Laupahoehoe Transportation Company, Inc. (Laupahoehoe), Central Transportation Company, Inc. (Central), Double K Transportation Services, Inc. (Double K), T & N Transportation Services, Inc. (T & N), and Chiaki Matsuo [2] (collectively, appellees or defendants).

The complaint alleged, inter alia, that appellees, acting in concert, created, operated, and/or controlled shell corporations to circumvent DAGS's bidding rules and specifications in order to: (1) gain unfair competitive advantage for Laupahoehoe and Central over other bidders; (2) attempt to monopolize the school bus industry; and (3) defraud the State and all prospective bidders. The complaint contained claims of: (1) unfair competition and attempted monopolization in violation of Hawai'i Revised Statutes (HRS) §§ 480–2(a) and 480–9 (1985 & Supp.1992) brought pursuant to HRS § 480–13(a) (Supp. 1992) (Count I); (2) violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., as to Laupahoehoe, Central, Matsuo, and Doe Defendants (Count II); (3) civil conspiracy by Laupahoehoe, Central, Double K, and Matsuo with respect to the Oahu Contract (Count III); (4) tortious interference with prospective business advantage by Laupahoehoe, Central, Double K, and Matsuo as to the Oahu Contract (Count IV); (5) civil conspiracy by Laupahoehoe, Central, T & N, and Matsuo with respect to the Big Island Contract (Count V); (6) tortious interference with prospective business advantage by Laupahoehoe, Central, T & N, and Matsuo with respect to the Big Island Contract (Count VI); and (7) punitive damages on all counts (Count VII).

After defendants moved to dismiss counts II, III, and V, the circuit court, on February 16, 1994, dismissed Count II with prejudice and declined to do so as to Counts III and V, insofar as they asserted a civil conspiracy to

1. RHSB and STI are subsidiaries of Robert's Hawaii, Inc. Robert's Hawaii, Inc. incorporated STI in May 1986 and RHSB in late 1990. Robert Iwamoto is President, Secretary, Director, and sole shareholder of Robert's Hawaii, Inc., RHSB, and STI.

2. Matsuo passed away on August 13, 1995. Nobu Shinohara was substituted as personal representative for Matsuo's Estate on November 3, 1995.

commit actionable wrongs. Bench trial commenced February 1, 1995 and concluded March 1, 1995. The trial court entered findings of fact (FOFs) and conclusions of law (COLs) on April 26, 1995. In short, the trial court held that there was insufficient evidence to: (1) find or conclude (a) that Double K and T & N were shell corporations or (b) that appellees engaged in unfair competition (with the exception of Matsuo and Laupahoehoe on the Big Island); (2) show a dangerous probability that defendants would successfully monopolize the geographic area of the State of Hawaii or any of its individual islands/counties; (3) establish that any two or more defendants conspired; (4) show that STI sustained injury or damages; and/or (5) show that STI's relationship with DAGS carried with it a future probability of success.

On appeal, appellants contend[3] that the trial court ignored substantial evidence in the record that: (1) Double K was operated as a shell corporation of Matsuo and Central, causing injury to RHSB; (2) T & N was operated as a shell corporation of Matsuo and Laupahoehoe, causing injury to STI; (3) defendants' conduct violated HRS §§ 480–2 and 480–9, causing antitrust injury and damage to RHSB and STI; (4) Central violated DAGS's rules by leasing buses to Ground Transport, Inc. (GTI), thereby causing injury to RHSB; (5) defendants' conduct was designed to disrupt the relationship between RHSB/STI and DAGS and tortiously interfered with appellants' prospective business advantage; and (6) two or more defendants-appellees conspired to engage in unfair competition and commit tortious interference.[4]

For the reasons discussed below, we affirm in part and vacate in part the circuit court's (1) FOFs and COLs, filed April 26, 1995, and (2) judgment entered May 18, 1995. We remand this matter to the circuit court for further findings and conclusions to be entered consistent with this opinion.

## I. BACKGROUND

### A. The School Bus Bid Controversy

#### 1. The Oahu Contract

On December 5, 1990, DAGS issued a request for sealed bids to procure student transportation for eighty-two designated Maui and Oahu school bus routes for the period of September 3, 1991 to June 1997 (hereinafter the "Oahu Contract"). The Oahu Contract was the first bid solicitation to include section 3.2.1 of the General Conditions and Special Provisions,[5] which required successful bidders to "implement and manage" the contract, to refrain from assigning, subcontracting, or selling the contract or its operation for four years, and to maintain its own baseyard "separate and apart from that of another school bus contractor doing business with the State." Section 3.2.1 also restricted the successful bidder from using buses that had been purchased, leased, or supplied by another bidder who had bid on the same routes or groups of routes, unless the losing bidder had lost more than fifty percent of its total routes maintained during the previous school year as the result of the bid proposal. A failure to provide the location of the baseyard and the buses to be used mandated rejection of the bid. Moreover, competing subsidiaries or jointly-owned companies were prohibited from submitting bids for the same routes. If competing subsidiaries or jointly-owned companies submitted bids, section 2.5 of the Purchasing and Supply Division's General Conditions, dated

---

**3.** Appellants challenge FOFs Nos. 18, 26, 42, 51, 54, 55, 68, 112, 115, 125, 135, 157, 168, 174, 194, and 195, and COLs Nos. 9, 10, 11, 12, 13, 14, 15, 16, 18, 20, 21, 22, 27, 29, 34, 35, 36, 37, 38, 40, 41, 42, 43, and 44.

**4.** Appellants also contest (1) the "order denying in part defendants' motion to dismiss the complaint" and (2) the trial court's denial of their motion for summary judgment; however, they did not include issue (1) in the points of error section in their opening brief and did not advance any argument or analysis on issues (1) or

(2). *See Associated Engineers & Contractors, Inc. v. State*, 58 Haw. 187, 215, 567 P.2d 397, 415, *reh' g denied*, 58 Haw. 322, 568 P.2d 512 (1977) (burden on party seeking reversal includes "the presentation of an analysis."). Because only issues presented pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(6) will be addressed, we decline to address these issues on appeal.

**5.** *See* HRS § 103–11 (1993) (DAGS's "rules shall have the force of law").

April 1, 1982, required submission of certificates of non-collusion.

Incorporated into DAGS's bid solicitations since the 1970s, Specification M, entitled "Prevention Against Monopolization of School Bus Routes," also provided:

> Inasmuch as the State is the sole customer of school bus services in Hawaii and therefore, school bus service seems to be a unique line of commerce, the State will deem it to be in its best interest to reject all or part of any bid if the effect of awarding part of or the entire bid may substantially lessen competition or tend to create a monopoly in the school bus industry in any one county within the State of Hawaii. Therefore, the State will consider the award of or control of more than 50% of the total routes to transport regular students to and from school in a particular county to have the effect of substantially lessening competition or tending to create a monopoly in that area of the State. The State will, therefore, reject that part of a bid which will allow a bidder to exceed the 50% figure specified herein and award that part of the bid to the next lowest bidder.

> However, the State retains the right to award more than 50% of the routes in any one county to a single bidder in those situations where: (1)[the] bidder is the sole bidder on a route or group of routes; (2) in the event that the difference between the lowest bid price and the second lowest bid price is more than ten percent (10%) above the bid price submitted by the lowest price bidder; or (3) the number of routes within the group which is required to exceed the 50% figure constitutes at least 75% of the group.

Finally, section 2.12(a) of the General Conditions provided that "[a] bidder shall be disqualified and his bid automatically rejected for ... [p]roof of collusion among bidders, in which case, all bids involved in the collusive action will be rejected and any participant [in] such collusion will be barred from future bidding until reinstated as a qualified bidder."

At trial, George Okano, a contract specialist in DAGS's student transportation branch during the relevant time period, testified that DAGS included the foregoing provisions to guarantee fairness, to prevent collusive bidding practices that DAGS suspected had occurred in the past, to address price fixing, and to insure that bidders were truly independent. Specifically, Okano testified that DAGS suspected prior collusive bidding practices between Laupahoehoe and T & N. Okano explained that Specification M was enacted to maximize competition within the industry and to address potential monopolies, but that, to his knowledge, DAGS had never enforced Specification M. According to Okano, certain defects could be waived, and Specification M was discretionary. However, defects were only waived so long as they did not violate the law, and collusion in violation of section 2.12 could not be waived.

### a. *The Participants on Oahu*

During the relevant times herein, Central was the largest school bus company on Oahu, controlling 207 out of 263 routes, approximately 78.7% of the Oahu market. Central and Laupahoehoe were wholly owned subsidiaries of C.M. Holding Corporation.[6] In 1990, Chiaki Matsuo owned ninety-four percent of C.M. Holding Corporation's stock; two of his daughters owned the remaining six percent. Matsuo, the former president of Central and Laupahoehoe, served as the chief executive officer of Central.

Sometime in 1990, DAGS held a pre-bid meeting to insure that bidders were aware of the new bid restrictions. Matsuo, Ralph Koga (Matsuo's administrative assistant and Central's vice-president), and Wesley Yamamoto (Laupahoehoe and Central's president and director from March 1987 to March 1992) attended the meeting. Matsuo became concerned over the effect that the new DAGS provisions would have on Central, because the Oahu Contract contained sixty-two of its existing routes. Yamamoto testified that Matsuo originated the idea of forming Double K. Matsuo testified, in deposition, that the primary reason for Double K's creation

---

**6.** Prior to 1990, Central was a division of Laupahoehoe, which was a wholly owned subsidiary of C.M. Holding Corporation. In 1990, C.M. Holding Corporation underwent major restructuring.

was to permit Central to "get around" the 50%/10% rule of Specification M, thereby permitting Central to lease its buses to the successful bidders. Yamamoto testified that he harbored concerns over the legality of Matsuo's idea and that he contacted an attorney.

Yamamoto approached his college friend, Kurt Kaminaka, in December 1990 and suggested forming Double K. Matsuo and Yamamoto assisted in Double K's incorporation. Matsuo's attorney was retained to incorporate Double K, and Matsuo furnished Double K with $72,500.00, later characterized by appellees as a "loan between friends." On December 3, 1990, two days before the Oahu Bid Request was published, Kurt and his father, Burt Kaminaka, incorporated Double K, each owning fifty percent of Double K's stock. Yamamoto testified that the Kaminakas were considered "silent or passive investors." They, however, invested no funding in Double K. The articles of incorporation named Kurt as president and director and Burt as vice-president and director. Philip N. Main, Central and Grayline Hawaii's Safety Director from 1972 to 1980 and 1982 to 1992, was named a director and vice-president of operations.[7]

### b. The Oahu Bids and Awards

On December 28, 1990, Double K submitted a sealed bid for the Oahu Contract, bidding on sixty-two of the routes operated by Central. Yamamoto and Koga drafted Double K's bid. The Kaminakas did not prepare Double K's bid. Central did not bid on the Oahu Contract and, instead, intended to lease buses to the successful bidders. According to Yamamoto, Matsuo intended to have Central lease its buses to Double K, if Double K was awarded routes.

RHSB submitted a bid proposal for the same sixty-two routes. The bids were opened on January 3, 1991. Neither Double K nor RHSB was the lowest bidder for any of the routes. Rather, Gomes School Bus Service was the lowest responsible bidder as to Groups 1, 2, 3, and 7, and Ground Transport, Inc. ("GTI") was the lowest responsible bidder as to Groups 4, 5, and 6. Double K submitted the second lowest bid and RHSB submitted the third lowest bid for Group 4. RHSB was the second lowest bidder as to Groups 5 and 6.

Sometime thereafter, GTI encountered problems in securing financing to acquire buses. RHSB suggested to GTI that it forfeit Groups 5 and 6. Instead, GTI forfeited the Group 4 routes on May 8, 1991 and leased buses for Groups 5 and 6 from Central. DAGS awarded Group 4 to Double K on May 13, 1991.

### c. RHSB's Complaints to DAGS

RHSB submitted a complaint to DAGS on May 31, 1991, protesting the award and claiming that Double K was a shell corporation formed by Matsuo and Laupahoehoe to circumvent Specification M. Because RHSB was the next lowest bidder after Double K, RHSB would have been awarded Group 4 if Double K and Central were disqualified.[8] As a result, DAGS initiated an investigation into Double K and Laupahoehoe's relationship, but DAGS's representatives never inquired into the relationship between Central and Double K.[9] On July 12, 1991, the state comptroller informed Double K of the allegations and requested, *inter alia*, lists of all loans within the past year and "copies of all prior agreements (between Laupahoehoe and Double K) for securing common equipment,

---

7. Even though Main's name is listed in the articles of incorporation, he never signed them or any other documents associated with Double K.

8. For Group 4, RHSB bid the total gross amount of $1,120.00 (for eight routes per day) versus Double K's $1,118.00. If Double K were a shell of Central, it would have had to bid $1,008.00 or less, *i.e.*, 10% less than the next lowest bidder to qualify as the lowest responsible bidder under Specification M, because Central, Double K's alter ego, already operated over fifty percent of the existing bus routes on Oahu. Okano testified that,

if Central had bid on Group 4, Central would have been disqualified by the fifty percent rule. Mits Nakatsuka also testified that, in the case of tie-bids, if one bidder already operated over fifty percent of the market routes, DAGS would automatically award the contract to the other bidder.

9. Explaining that DAGS apparently did not ask the right questions, Okano testified that the defendants did not "lead [him] astray," but "nobody turned the lights on" either.

maintenance, personnel, facilities, or leases, etc." DAGS explained that, if appellants' protest claims were true, the "award will not be made to Double K but instead to the next lowest bidder." In a responsive letter dated July 17, 1991, Kurt Kaminaka stated that he was "surprised, concerned and upset about [the] unsubstantiated allegations," and informed DAGS that (1) Double K had no outstanding loans and (2) there were no written agreements between Laupahoehoe and Double K at that time.

As part of the initial investigation conducted after the bid opening, but prior to the award, Okano drove to the site Double K identified as its baseyard and examined City and County zoning maps. He discovered a vacant lot with a zoning designation that did not permit it to be used as a baseyard. By letter, Double K was directed to secure a baseyard. It complied. On August 22, 1991, DAGS informed RHSB that, "[i]n response to your client's belief that Double K Transportation, Inc. is a 'shell' corporation of Laupahoehoe Transportation Co., our Office of the Attorney General's investigation turned up no evidence to support the claim." DAGS formally awarded the eight routes of Group 4 to Double K. RHSB again protested.

In 1991, after the award of the contract, DAGS continued to monitor Double K's compliance. Patrick Dela Garza, Double K's operations manager during the relevant time period, denied any relationship between Central and Double K. However, subsequent investigation revealed that Central ran the daily operations of Double K. Double K leased from eight to twelve buses from Central, although, at trial, defendants were unable to produce a lease agreement. Central maintained all Double K buses, including inspection, fueling, and repairs. Central also prepared Double K's bookkeeping, financial records, and payroll and retained custody of and used Kurt's signature stamp. Double K, however, maintained separate bank accounts, filed separate tax returns, and accounted for its profits and losses independently of those of Laupahoehoe and Central.

During pretrial discovery, Kurt Kaminaka testified in deposition that Double K leased buses from Laupahoehoe and/or Central and that he viewed the two entities (Laupahoehoe and Central) as one and the same. He also remembered the $72,500.00 loan from Matsuo but could not explain his failure to inform DAGS of its existence. Apparently, because of a falling out between Yamamoto and Matsuo, Yamamoto left Central and Laupahoehoe in 1992. Upon Yamamoto's departure, Matsuo approached Eugene Obara and asked him to become president of Double K, replacing Kurt Kaminaka. Eugene testified, in deposition, that it was his understanding that Matsuo owned and controlled Double K. Eugene and his brother, Dennis, purchased the Kaminakas' stock in mid-July 1992 with $15,000 provided by Koga. According to Eugene, Koga instructed him to deposit the funds into his personal checking account and pay the Kaminakas with a personal check. The Obara brothers thereafter became officers, directors, and shareholders of Double K. Like the Kaminakas, they had no experience in running a school bus company and invested no money in Double K. The Obaras resigned on April 27, 1993. On or about July 2, 1993, the Obaras assigned their stock to Central to pay Double K's outstanding debts to Central. Neither Obara received any consideration for the shares, and a stock purchase agreement was never produced. Koga became the Double K operations manager. Dela Garza, apparently fired and disgruntled, contacted Okano and "changed his tune," admitting that Double K was, in fact, controlled by Central.

### 2. The Big Island Contract

On January 27, 1992, DAGS issued a request for sealed bids to procure student transportation for designated Hawaii school bus routes for the period of September 1, 1992 to June 1998 (hereinafter the "Big Island Contract"). Similarly to the Oahu Contract, the bid specifications required independence and prohibited collusion and monopolization.

### a. The Participants on the Big Island

In 1990, Laupahoehoe was the largest school bus operator on the island of Hawai'i, operating 91 out of 141 routes and controlling approximately 63.8% of the Big Island mar-

ket. Matsuo was the chairman, president, and CEO of Laupahoehoe. Yamamoto later succeeded Matsuo as president. STI, by comparison, had never bid on a bus contract. At that time, STI did not have an existing operation on the Big Island.

Similarly to Double K, T & N was conceived by Matsuo. Matsuo's self-described friend of twenty years, Ted Ura, however, incorporated T & N on June 3, 1988. Ura could not recall who prepared or drafted the articles, but he recalled signing them in Laupahoehoe's office. Matsuo approached Nobu Shinohara, the existing CEO of Bacon Universal Co., Inc., and asked him to become an officer and director of T & N. Ura was sole shareholder of T & N and became president, treasurer, and director. His wife also became an officer. T & N never convened any board meetings.

Although Ura testified that he operated T & N out of his home upon its incorporation, he could not recall performing any work for T & N from 1988 until the award of the Big Island Contract in 1991. Ura testified that Matsuo loaned him money to "start-up" T & N, to keep T & N "rolling" until the bid was awarded, and to obtain surety bonds. Ura also stated that Matsuo extended several loans to T & N, none of which were memorialized in writing, and that T & N had repaid Matsuo. Prior to incorporating T & N, Ura was a retired high school football coach and counselor, who worked for Laupahoehoe, sweeping its office and washing buses.[10] Shinohara never participated in the daily operations of T & N, and in October 1992, he resigned, becoming president of Central, Laupahoehoe, and other companies of Matsuo. Although Ura testified that he ran the company, he conceded that T & N could not have been formed without the active assistance of Matsuo and Laupahoehoe.

b. *The Big Island Bids and Awards*

Matsuo and Dayton Oniwa (Matsuo's administrative assistant) prepared T & N's bid proposal. Ura testified that, because he had no experience in preparing school bus bids, he asked Matsuo to assist him and that Mat-

suo helped him in any financial matters. Although T & N's bid amount was always lower, Laupahoehoe bid on the same groups of routes, apparently without Ura's knowledge. Ura explained that he only browsed through the contract specifications and that he did not know that T & N was violating any provisions.

T & N submitted bids for all Big Island routes. It was the responsible low bidder as to Groups 2 and 3, for which Matsuo supplied the bid guaranties. STI and Laupahoehoe also submitted bids for all routes but were not the lowest bidders as to any group of them. On group 3, STI and Laupahoehoe submitted identical bids, which were the second lowest. V. Bragado Bus Co. (Bragado) was the lowest responsible bidder as to Groups 1 and 4 and was awarded these groups.

Appellees adduced evidence that, after entering into the contract with DAGS for Groups 2 and 3, Ura supervised the daily operations of T & N, often spending twelve or more hours per day at the baseyard. Ura dispatched the buses, supervised the drivers, prepared the daily worksheets and bimonthly billings, handled complaints from parents, and produced a company newsletter. He reviewed T & N's accounting books and checkbook and possessed sole authority to sign T & N checks. However, T & N employed no bookkeepers or accountants on its payroll. Ura received a salary of $800.00 per month and had the use of a company car. T & N maintained its own bank accounts and books.

Appellants adduced evidence that, according to Koga, Ura was akin to an operations manager. Moreover, in contravention of bid rules, T & N shared office space with Laupahoehoe, leased its baseyard and all of its buses from Laupahoehoe, and had a standing order for replacement buses in the event of a breakdown. Laupahoehoe also serviced, repaired, and fueled T & N's vehicles, and provided the bus drivers. Laupahoehoe retained custody of T & N's checkbook and performed T & N's administrative work, in-

---

10. After retiring from the DOE in 1985, Ura was unemployed for a year-and-a-half and then worked as personnel director of Suisan for one year.

cluding bookkeeping, accounts payable and receivable, driver payroll, and taxes. Matsuo paid T & N's legal fees.

With respect to the lease and servicing agreements, Ura testified that he never negotiated any of the T & N/Laupahoehoe contracts. He relied on Laupahoehoe to give him a fair deal. When asked why he permitted a competitor to prepare T & N's bid, Ura stated that he trusted Matsuo and Laupahoehoe. When asked at trial what he did for T & N in "terms of running the company," Ura testified that he "had to go and scrub, clean the place, cut the grass, poison the grass, pick up rubbish, and clean up the baseyard and today what I do is I make sure that the place is clean, scrub the toilet, mop the place." Ura was also the company cook.

B. *The Trial Court's FOFs and COLs*

Bench trial commenced on February 1, 1995 and concluded on March 1, 1995. The trial court entered FOFs and COLs on April 26, 1995. The trial court found and concluded, in pertinent part as follows:

### DAMAGES

181. RHSB did not realize net profits, but rather sustained net losses for each year during the period from 1992 to 1994.

182. In 1991, Double K sustained a net loss of $1,825.00.

183. In 1992, Double K's net income was $2,608.00.

184. In 1993, Double K sustained a net loss of $3,474.00.

185. For the years 1991–1993, Double K sustained an aggregate net loss of $2,691.00.

186. In 1991, T & N's net income was $3,104.

187. In 1992, T & N incurred a net loss of $11,976.00.

188. In 1993, T & N's net income was $3,871.00.

189. For the years 1991–1993, T & N sustained an aggregate net loss of $5,001.00,

. . . .

191. As to Plaintiff's claim for lost profit damages, the total revenue Plaintiffs claim they would have received if the forty-one (41) routes in question had been awarded to them, is the sum of the following:

(a) Contract revenue for the forty-one (41) routes, calculated at Plaintiff's bid prices, and

(b) Charter revenue projected at 40% of contract revenue ("charter revenue ratio").

192. The amount of charter revenue is determined by such factors as price, marketing strategy, service and bus capacity.

193. A company is free to market routes in an area of the State or an island regardless of whether or not it operates any school bus contract routes in that particular area.

194. With regard to the Big Island routes, there is insufficient evidence to show a correlation between charter revenue and contract revenue.

195. Without charter revenue, STI would have sustained a net loss, rather than a net profit, in operating the Big Island routes at its bid price.

. . . .

### CONCLUSIONS OF LAW

. . . .

9. There is insufficient evidence to show that Double K was merely an agency, instrumentality, adjunct or alter ego of Central, Laupahoehoe, and/or Matsuo while under the ownership of the Kaminakas.

10. There is insufficient evidence to show that Central, Laupahoehoe or Matsuo dominated the finances, policy and practices of Double K during the Kaminakas' ownership to such an extent that Double K had no separate mind, will or existence of its own but was simply a business conduit for Central, Laupahoehoe, and/or Matsuo.

11. There is insufficient evidence to show that Double K was controlled by and operated solely for the benefit of Central,

Laupahoehoe, and/or Matsuo during the Kaminakas' ownership.

. . . .

13. There is insufficient evidence to show that T & N was controlled by and operated solely for the benefit of Central, Laupahoehoe, and/or Matsuo.

14. There is insufficient evidence to show that T & N was merely an agency, instrumentality, adjunct or alter ego of Central, Laupahoehoe, and/or Matsuo or that these Defendants dominated T & N's finances, policies and practices to such an extent that T & N had no separate mind, will or existence of its own but was simply a business conduit for Central, Laupahoehoe, and/or Matsuo.

15. The Special Provision of both IFB No. F–91–140–MO and IFB No. F–92–250–H prohibited Double K and T & N from using busses [sic] that were "purchased, leased, loaned or in any other way supplied by another bidder who submitted a bid for the same routes or group of routes." T & N and Tadashi Ura were not aware that Laupahoehoe also bid on IFB No. F–92–250–H, and unknowingly violated this provision by leasing busses [sic] from Laupahoehoe. Double K did not violate this provision.

16. Double K violated the Special Provisions which required a bidder to have its own baseyard "separate and apart from that of another school bus contractor doing business in the State." . . . After Double K entered into the contract with DAGS for the Group 4 routes, however, DAGS notified Double K of the violation and directed Double K to correct the breach. Double K cured the breach to the satisfaction of DAGS.

17. The Special Provisions of IFB NO. F–92–250–H required that: (a) T & N have "its own base of operation from which to perform all substantive administrative requirements of the contract," (b) T & N's base of operation be solely under its control and physically separate and apart from that of any other school bus contractor doing business with the State, and (c) T & N have its own personnel, office space, telephones and whatever else necessary to constitute a business which is separate and apart from any other school bus contractor doing business with the State. . . .

18. After contracting with T & N for the Group 3 routes on the Big Island, DAGS monitored T & N's operation and notified T & N that it must comply with the foregoing requirements. The evidence shows that T & N complied in this regard to the satisfaction of DAGS.

19. T & N violated the Special Provisions of IFB No. F–92–250–H, which prohibited T & N from fueling, servicing, or repairing its busses [sic] at the facility of another school bus contractor doing business with the State.

. . . .

22. Except as provided in paragraphs 38, 39, and 41 of these COL, the evidence is not sufficient to establish that Defendants' conduct constituted unfair competition under Section 480–2, HRS, or that Defendants' conduct was designed to disrupt the relationship between DAGS and the Plaintiffs relative to the claim of tortious interference with prospective business advantage.

23. There are four essential elements of an attempt to monopolize claim: 1) specific intent to control prices or destroy competition with respect to a part[icular] commerce; 2) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose; 3) a dangerous probability of success; and 4) antitrust injury.

The trial court next compared the parties' market shares on Oahu and the Big Island from 1990 through 1993. The trial court noted that, in 1990, Central and Laupahoehoe operated approximately 78.7% of the routes on Oahu and 52.9% of the routes in the State. Double K maintained 3% of the Oahu market, and T & N maintained 10.2% of the Big Island market. Laupahoehoe also operated approximately 63.8% of the routes on the Big Island. By 1993, their shares had declined to 3.2% on Oahu and to 16.9% in the state. During the same time period, RHSB's share of the Oahu market had increased from zero to 39.9% and from 14% to 33.5% in the state. The trial court then ruled that:

34. Whether the geographic market is identified by the physical boundaries of each island or the entire State of Hawai[']i, the evidence is insufficient to show a dangerous probability of success by Defendants in these geographic markets to sustain Plaintiffs' attempt to monopolize claim.

. . . .

36. Except as provided in paragraphs 38, 39, and 41 of these COL, the evidence is insufficient to establish Defendants' specific intent to hinder or destroy competition or monopolize the school bus industry in Oahu, the Big Island, or the State of Hawai[']i.

37. The evidence is insufficient to establish that any two or more of the Defendants engaged in concerted action to accomplish an unlawful objective. Plaintiffs do not prevail on their claims of conspiracy.

38. Laupahoehoe and Matsuo calculated and designated the bid amounts in the bid proposals submitted by Laupahoehoe and T & N. . . . Although Laupahoehoe and Matsuo were aware, T & N and Ted Ura were not aware, that Laupahoehoe intended to bid [on the same contract] . . . when Matsuo and Laupahoehoe assisted T & N with its bid preparation.

39. The conduct of Laupahoehoe and Matsuo operated to hinder competition among bidders and was designed to secure an unfair advantage for Laupahoehoe. Such conduct is contrary to the competitive bidding law and against public policy.

40. However, the evidence is insufficient to show that STI sustained injury or damage as a result of the conduct described in Paragraph 38 of these COL, or that STI would have realized a net profit if DAGS had awarded STI the four (4) Big Island routes of Group 3.

41. The Court concludes that the conduct of Laupahoehoe and Matsuo described in Paragraph 38 of these COL constitutes an unfair method of competition under Section 480-2, HRS. However, as there is insufficient evidence to show actual injury or damage to STI resulting from such wrongful conduct or a danger-

ous probability of Defendants' success in monopolizing the school bus market in Oahu, the Big Island, or the State of Hawai[']i, Plaintiffs do not prevail on their claims under Chapter 480, HRS.

42. The evidence is also insufficient to sustain Plaintiffs' claim against Defendants Matsuo and Laupahoehoe for tortious interference with prospective business advantage, based upon the conduct described in Paragraph 38 of these COL. As a bidder for the routes in IFB No. F-92-250-H [the Hawai'i Bus Contract], Plaintiff STI had an economic relationship with DAGS, of which Matsuo and Laupahoehoe were aware. However, there is insufficient evidence to show that the relationship had the probability of ripening into a future economic benefit for STI, or that the Big Island routes would have been awarded to STI if Laupahoehoe and Matsuo had not engaged in the conduct described in Paragraph 38 of these COL, or that such conduct caused injury or damage to STI.

43. The Court concludes that there is insufficient evidence to sustain any cause of action asserted by Plaintiffs against Defendants.

44. Accordingly, Judgment shall be entered in favor of Defendants . . . and against Plaintiffs . . . as to all claims against Defendants.

Final judgment was entered on May 18, 1995. This appeal ensued.

## II. *STANDARDS OF REVIEW*

■ Generally speaking, the question whether a corporation is a mere agency, instrumentality, or alter ego of another corporation or individual is one of fact. *See* 1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.95, at 699–705 (perm. ed.1999) (hereafter *Fletcher Cyclopedia*). However,

[w]hen all material facts are undisputed, application of the alter-ego doctrine is a question of law. Thus, summary judgment may be granted in a case where no genuine issue of fact is raised or shown. However, it is recognized that the determination of whether there are sufficient grounds for

piercing the corporate veil ordinarily should not be disposed of by summary judgment, in view of the complex economic questions often involved, especially if fraud is alleged.

*Id.* at 699–700 (footnotes omitted).

 The question whether one's actions amount to unfair methods of competition is also one of fact. We review a trial court's findings of fact under the clearly erroneous standard. *See Associates Fin. Services Co. of Hawaii, Inc. v. Mijo,* 87 Hawai'i 19, 28, 950 P.2d 1219, 1228 (1998) (citations omitted). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *In re Estate of Marcos,* 88 Hawai'i 148, 153, 963 P.2d 1124, 1129 (1998) (citation omitted). Findings of fact that are unchallenged on appeal are the operative facts of a case. *See Crosby v. State Dept. of Budget & Finance,* 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995) (citation omitted).

 Hawai'i appellate courts review conclusions of law *de novo,* under the right/wrong standard. *See Associates Fin. Services Co. of Hawaii, Inc.,* 87 Hawai'i at 28, 950 P.2d at 1228. "Under the right/wrong standard, this court 'examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it.'" *Estate of Marcos,* 88 Hawai'i at 153, 963 P.2d at 1129 (citation omitted). A conclusion of law will not be overturned if supported by the trial court's findings of fact and by the application of the correct rule of law. *See Hilo Crane Service, Inc. v. Ho,* 5 Haw.App. 360, 378–79, 693 P.2d 412, 424 (1984), *cert. denied,* 67 Haw. 685, 744 P.2d 781 (1985). However, a trial court's label is not determinative of the standard of review to be applied on appeal. *See Crosby,* 76 Hawai'i at 340, 876 P.2d at 1308.

 "The interpretation of a statute is [also] a question of law reviewable *de novo.*" *Wilson v. AIG Hawaii Ins. Co.,* 89 Hawai'i 45, 47, 968 P.2d 647, 649 (1998) (brackets added) (citation omitted). Furthermore,

[t]he starting point in statutory construction is to determine the legislative intent from the language of the statute itself. Our foremost obligation when interpreting a statute is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. We read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Id.* (quoting *Mendes v. Hawai'i Ins. Guar. Ass'n,* 87 Hawai'i 14, 17, 950 P.2d 1214, 1217 (1998) (internal citations, quotation marks, and brackets omitted)).

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(10) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.... This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Government Employees Ins. Co. v. Dang,* 89 Hawai'i 8, 12, 967 P.2d 1066, 1070 (1998) (quoting *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998))(some internal citations omitted).

 Finally, an award or denial of punitive damages is within the sound discretion of the trier of fact and will not be reversed absent a clear abuse of discretion. *See Ditto v. McCurdy,* 86 Hawai'i 84, 91, 947

P.2d 952, 959 (1997) (citations omitted). "A court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Ho v. Leftwich*, 88 Hawai'i 251, 256, 965 P.2d 793, 798 (1998) (citations, internal quotation marks, and ellipses omitted).

## III. *DISCUSSION*

A. *Standing under HRS Chapter 103: The Viability of Appellants' Claims within the State Bidding Process*

 Appellee T & N contends that the Hawai'i Public Procurement Code and DAGS's General Conditions do not provide for a private cause of action against a successful bidder on the part of the disappointed bidder, and, therefore, that appellants' claims are barred. We disagree. The General Conditions, which were adopted on April 1, 1982 pursuant to HRS Chapter 103 (1965 & 1985), did not limit legal remedies. At most, the General Conditions limited the liability of the State and gave broad discretion to the state agency to review bids and to award or terminate contracts. Further, HRS Chapter 103 did not contain the "Exclusivity of Remedies" provision that it contains today. *See* HRS §§ 103D–704 (1993);[11] *In re Southern Foods Group, L.P., dba Meadow Gold Dairies*, 89 Hawai'i 443, 974 P.2d 1033 (1999). In fact, prior to the 1992 amendments to the Hawai'i Public Procurement Code, an "informal" legal remedy evolved whereby the disappointed bidder sought declaratory relief as a taxpayer. *See Brewer Envtl. Indus. Inc. v. A.A.T. Chem., Inc.*, 73 Haw. 344, 347, 832 P.2d 276, 278 (1992); *Wilson v. Lord–Young Eng'g Co.*, 21 Haw. 87, 88, 94 (1912). Because this remedy was not binding, neither HRS Chapter 103 (1985) nor the General Conditions precluded appellants' cause of action.

 Appellants in the present case challenge the trial court's (1) refusal to disqualify appellees and (2) findings and conclusions regarding DAGS's discretion to enforce bidding rules and to award contracts. Appel-

lants seek equitable relief with respect to contracts between DAGS and the winning bidders. However, DAGS is not a party to the instant action. Appellants cite no authority to support their assertion that a trial court has the authority to disqualify a bidder based upon violations of DAGS's regulations or upon its failure to enforce such regulations *when the State of Hawai'i, here DAGS, is not a party. See generally Rose v. Oba*, 68 Haw. 422, 425–26, 717 P.2d 1029, 1031 (1986) (stating that agency regulations affect internal management and do not affect private rights of or procedures available to the public). Insofar as DAGS is not a party, the trial court properly refused to disqualify appellees.

B. *The Alter Ego and Piercing the Corporate Veil Doctrines*

Appellants advocate for the disregard of Double K and T & N's corporate identities by application of the doctrine known as "piercing the corporate veil." We agree with appellants' characterization of Double K and T & N as shell corporations, yet disagree with appellants' request to pierce the corporate veil.

 It is well settled that establishing a corporation to limit personal liability is proper and is, alone, an insufficient basis for the application of the doctrines of alter ego or piercing the corporate veil. *See* 1 *Fletcher Cyclopedia, supra*, § 41.20, at 596; *see generally Henry Waterhouse Trust Co. v. Home Ins. Co. of Hawai'i*, 27 Haw. 572, 581–82 (1923).

The common purpose of statutes providing limited shareholder liability is to offer a valuable incentive to business investment. Although the greatest judicial deference normally is accorded to the separate corporate entity, this entity is still a fiction. Thus, when particular circumstances merit—*e.g.*, when the incentive value of limited liability is outweighed by the competing value of basic fairness to parties dealing with the corporation—courts may look past a corporation's formal existence

---

11. We expressly decline to decide whether appellants' claims would be preempted by HRS Chapter 103D (1993). We leave that issue for another day.

to hold shareholders or other controlling individuals liable for "corporate" obligations. *Labadie Coal Co. v. Black,* 672 F.2d 92, 96 (D.C.Cir.1982) (citing Dodd, *The Evolution of Limited Liability in American Industry,* 61 Harv.L.Rev. 1351 (1948)). When a corporation is the mere instrumentality or business conduit of another corporation or person, the corporate form may be disregarded.

The alter ego doctrine has been adopted by the courts in cases where the corporate entity has been used as a subterfuge and to observe it would work an injustice. The rationale behind the theory is that, if the shareholders or the corporations themselves disregard the proper formalities of a corporation, then the law will do likewise as necessary to protect individual and corporate creditors. The rule is designed to give incentives to those using the corporate form to obey the state's laws fully by maintaining the formalities and the legal separateness of the corporation. Thus, those who fail to maintain the corporate formalities cannot expect the state to grant them the limited liability that flows from the corporate form. While the instrumentality doctrine has its origin in the context of parent-subsidiary relationships, it has been suggested that a similar analysis is applicable to an individual shareholder's relationship with a corporation.

A claim based on the alter ego theory is not in itself a claim for substantive relief, but rather to disregard the corporation as a distinct defendant is procedural. A finding of fact of alter ego, standing alone, creates no cause of action. It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation. An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract. The alter ego doctrine is thus remedial, not defensive, in nature. *One who seeks to disregard the corporate veil must show that the corporate form has been abused to the injury of a third person.*

Courts apply the alter ego doctrine with great caution and reluctance. In fact, many courts require exceptional circumstances before disregarding the corporate form.

1 *Fletcher Cyclopedia, supra,* § 41.10, at 568–581 (emphasis added).[12]

Accordingly, we must decide whether Laupahoehoe and Central were the alter egos of Double K and T & N and whether the corporate veil ought to be pierced in the instant case.

### 1. The Alter Ego Doctrine

Appellants argue that the trial court's findings and conclusions that Double K and T & N were not shell corporations of Central, Laupahoehoe, and/or Matsuo were clearly erroneous. We agree with respect to Central and Laupahoehoe.

 Generally speaking, a corporation will be deemed the alter ego of another "where recognition of the corporate fiction would bring about injustice and inequity or

---

12. Hawai'i courts have been reluctant to disregard the corporate entity. *See Evanston Ins. Co. v. Luko,* 7 Haw.App. 520, 525, 783 P.2d 293, 297 (1989) (piercing corporate veil will "accomplish nothing"); *Hilo Crane Service,* 5 Haw.App. at 374–75, 693 P.2d at 422 (refusing to disregard corporate entity to apply principle of equitable subordination, stating that "mere control or domination of a corporation is not proscribed by law and is in itself insufficient to justify piercing the corporate veil and subordinating claims"); *Chung v. Animal Clinic, Inc.,* 63 Haw. 642, 645, 636 P.2d 721, 723 (1981) (refusing to pierce corporate veil in order to deny owner/employee's workers' compensation benefits); *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 526, 543 P.2d 1356, 1360 (1975) (refusing to apply alter ego doctrine); *Tropic Builders, Ltd. v. Naval Ammunition Depot Lualualei Quarters, Inc.,* 48 Haw. 306, 326, 402 P.2d 440, 452 (1965) ("[W]e see no valid reason why the corporate veil should be pierced merely to add another string to plaintiff's bow."); *Henry Waterhouse Trust Co.,* 27 Haw. at 582, 586 (refusing to pierce corporate veil and stating that party claiming corporation is mere instrumentality carries the burden of proof); *cf. Kahili, Inc. v. Yamamoto,* 54 Haw. 267, 269–70, 271–72, 506 P.2d 9, 11–12 (1973) (piercing corporate veil because (1) two shareholders owned all stock, (2) corporation was undercapitalized, and (3) shareholders' behavior in lease negotiations suggested they were acting for their behalf rather than for the corporation).

when there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat a rightful claim." *Chung v. Animal Clinic, Inc.,* 63 Haw. 642, 645, 636 P.2d 721, 723 (1981); *see also Kahili, Inc. v. Yamamoto,* 54 Haw. 267, 271–72, 506 P.2d 9, 11–12 (1973).

> Before a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that [1] the corporation is not only influenced and governed by that person, but that there is such a unity of interest ... that the individuality, or separateness, of such person and corporation has ceased, and [2] that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

*Associated Vendors, Inc. v. Oakland Meat Co., Inc.,* 210 Cal.App.2d 825, 26 Cal.Rptr. 806, 813 (1962) (citations and internal quotation marks omitted). In *Oakland Meat Co.,* 26 Cal.Rptr. at 813–15, the California Court of Appeals catalogued factors that many courts have weighed in determining whether a corporate entity is the alter ego of another. These include:

> ■ Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] *identi[ty] of ... directors and officers of the two entities in the responsible supervision and management*; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] *the use of the same office or business location*; [10] *the employment of the same employees and/or attorney*; [11] the *failure to adequately capitalize a corporation*; [12] *the total absence of corporate assets, and undercapitalization*; [13] *the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation*; [14] *the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities*; [15] *the disregard of legal formalities and the failure to maintain arm's length relationships among related entities*; [16] the use of the corporate entity to procure labor, services or merchandise for another person or entity; [17] the diversion stockholder [sic] or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions; and [19] the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Id.* (internal citations omitted) (brackets and emphases added).

This list, however, is not exhaustive. For example, other courts have looked at: (1) incorporation for the purpose of circumventing public policy or statutes; (2) whether the parent finances the subsidiary; (3) whether the subsidiary has no business or assets except those conveyed to it by the parent; (4) whether the parent uses the subsidiary's property as its own; (5) whether the directors of the subsidiary do not act independently in the interest of the corporation but take their orders from and serve the parent; and (6) whether the "fiction of corporate entity ... has been adopted or used to evade the provisions of a statute." *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710, 717 (7th Cir. 1965); *see also Central States, Southeast and Southwest Areas Pension Fund v. Sloan,* 902 F.2d 593, 596–98 (7th Cir.1990) (finding that creation of alter ego was motivated by a desire to circumvent federal pension fund laws); *Houston–American Life Ins. Co. v.*

*Tate,* 358 S.W.2d 645, 656 (Tex.Civ.App.1962) (corporate fiction ignored when it is used, *inter alia,* to "achieve or perpetrate monopoly" or to circumvent the insurance code and usury statutes); *United States v. Advance Machine Co.,* 547 F.Supp. 1085, 1093 (D.Minn.1982) ("The law will not recognize corporate formalities used to circumvent statutory policy or to violate a law."); 1 *Fletcher, supra,* § 43.20, at 767 ("[S]hared officers and directors are a strong indication of control by the parent, and may be taken into consideration by a court as inferring domination. Thus, a careful review of the entire relationship between various corporate entities, their directors and officers, may reveal that piercing the corporate veil is warranted.").[13] Ultimately, no one factor is dispositive.

 Appellees contended below that exclusive stock ownership is a prerequisite to a conventional alter ego action. In support of appellees' argument that, at least, "some ownership" interest is required, they cited *Evanston Ins. Co. v. Luko,* 7 Haw.App. 520, 525, 783 P.2d 293, 297 (1989), and *Estate of Daily v. Title Guar. Escrow Serv., Inc.,* 178 B.R. 837, 845 (D.Haw.1995), *aff'd,* 81 F.3d 167 (9th Cir.1996). This court has stated that exclusive ownership and control are not "solely determinative on the issue of whether we should disregard the corporate entity...." *Chung,* 63 Haw. at 646, 636 P.2d at 724. Indeed, "[t]he question is one of control, not merely paper ownership." *Labadie Coal Co.,* 672 F.2d at 97. The mere existence or nonexistence of formal stock ownership is not conclusive. *See J.J. McCaskill Co. v. United States,* 216 U.S. 504, 515, 30 S.Ct. 386, 54 L.Ed. 590 (1910) (looking "beyond the corporate form to the purpose of it"); *Wolfe v. United States,* 798 F.2d 1241, 1242 (9th Cir.), *amended on other grounds,* 806 F.2d 1410 (9th Cir.1986), *cert. denied,*

482 U.S. 927, 107 S.Ct. 3210, 96 L.Ed.2d 697 (1987) (corporation may have separate tax status but be so dominated that it may be regarded as an alter ego); *Shades Ridge Holding Co., Inc. v. United States,* 880 F.2d 342, 345–46 (11th Cir.1989), *amended on other grounds,* 888 F.2d 725, *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990); *cf. In re Tax Appeal of Ulupalakua Ranch, Inc.,* 52 Haw. 557, 562, 481 P.2d 612, 615 (1971) (stating that to hold a taxable event had occurred under the general excise law would be "to overemphasize form and to ignore the underlying realities of the situation"); 1 *Fletcher Cyclopedia, supra,* § 41.10, at 581. Therefore, because control is determined by the actual relationship of the parties, formal stock ownership is not dispositive.

 Applying the aforementioned legal standards to the instant case, we are led ineluctably to hold that Central was the alter ego of Double K and that Laupahoehoe was the alter ego of T & N. In order to guarantee fairness and to prevent collusive[14] bidding practices and monopolization, the bid solicitations for the Oahu and Big Island Contracts contained special provisions that restricted the successful bidders from purchasing, leasing, or using the buses of another bidder who had bid on the same routes or groups of routes. Successful bidders were also required to: (1) "implement and manage" the contract; (2) refrain from assigning, subcontracting, or selling the contract or its operation for four years; and (3) maintain a separate baseyard, "separate and apart from that of another school bus contractor doing business with the State." Competing subsidiaries and/or jointly-owned companies were not permitted to submit bids for the same routes or groups of routes. Further, Specification M's primary purpose was to maximize com-

---

13. *See* HRS § 480–8 (1993), which prohibits "interlocking directorates and relationships" that work to eliminate competition by agreement.

14. Collusion is defined as

 [a]n agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of

lawful means for the accomplishment of an unlawful purpose. *Tomiyasu v. Golden,* 81 Nev. 140, 400 P.2d 415, 417[, *cert. denied,* 382 U.S. 844, 86 S.Ct. 89, 15 L.Ed.2d 85 (1965)]. A secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purpose. *See* Conspiracy. Black's Law Dictionary 264 (6th ed.1990) (brackets added).

petition within the industry and to address potential monopolies.[15] We reiterate that it is not improper, in and of itself, to form corporations to limit liability; however, it is improper to create or operate another corporate entity in order to circumvent agency rules and regulations carrying the force and effect of law and to contravene clearly enunciated public policy proscribing collusion and monopolization.

With respect to the Oahu Contract, Matsuo and Central created Double K in order to control Double K and its bids, while simultaneously leasing Central's buses to Double K and GTI. Matsuo admitted in deposition, and Yamamoto testified at trial, that Matsuo had conceived the idea of forming Double K to circumvent Specification M's ten percent handicap and DAGS's new bus lease restrictions, rather than risk submitting a losing bid and being precluded from leasing Central's buses. Yamamoto, Central's vice-president, suggested the idea to Kurt Kaminaka. Matsuo's attorney incorporated Double K. Matsuo provided Double K with $72,500.00 for start-up. Double K's articles of incorporation authorized the issuance of 250,000 shares of capital stock with a par value of $1.00 per share, yet Double K had no assets except for Matsuo's loan. Although called silent investors by Yamamoto, the Kaminakas, as the incorporating shareholders, never personally paid for any of the stock issued to them and never invested any money in Double K. Burt Kaminaka and Philip Main were shocked to discover that they were officers and directors of Double K. Kurt Kaminaka, the president of Double K during the relevant period, did not know: (1) whether Double K had sustained a profit or loss during his ownership of the corporation; (2) the name of the bank where Double K maintained its accounts; or (3) the address or geographical location of its baseyard.

Eugene Obara was asked by Matsuo to become president of Double K and was assured by Matsuo and Koga that he would not have to do any work. Eugene testified that Koga gave him $15,000.00 with instructions to deposit the money into his personal checking account and to write a personal check to Kurt Kaminaka. When Double K was sold to the Obaras, Kurt did not negotiate the terms of the sale, yet he received $15,000.00 for the outstanding shares of Double K. The Obaras, like Kurt, also did not participate in the sale negotiations. The Obaras and Kaminakas never attended any board meetings, could not identify where Double K's office and baseyard were located, did not know how many buses, drivers, or routes Double K managed, and were unaware whether Double K made a profit or loss between 1991 and 1993. Dennis Obara was also "shocked" to discover that he was an officer and director of Double K. The Obaras did not know when their shares were sold, never received any consideration for them, and could not produce any documents transferring or selling their stock to Central, the subsequent owner of record.

With respect to Double K's school bus operation bids, Matsuo and Koga prepared Double K's bid on the Oahu Contract. Kurt's involvement in the process was limited to signing the bid proposal. Double K shared the same baseyard and office space with Central. Employees of Central performed all of Double K's administrative tasks, including the preparation of financial records, tax returns, and payroll. Central had custody of Kurt's signature stamp, which was used on all checks and other matters. Additionally, Central leased approximately ten or twelve buses to Double K, maintained the vehicles, and provided the drivers. When DAGS conducted its investigation of Double K, Double K concealed evidence of loans and lease arrangements with Central. In fact, during his deposition, Kurt Kaminaka testified that he believed that both the clerical tasks and the bus arrangements were provided pursuant to a lease. Yet Kurt could not explain why he had told the State Comptroller, in his July 17, 1991 letter to DAGS, that no loan agreements or "written" leases existed between Double K and Laupahoehoe, especially in light of the fact that he

---

15. As noted earlier, HRS § 103–11 expressly provides that DAGS's "rules shall have the force of law."

considered Central and Laupahoehoe to be the same entity.

On this record, Double K was so organized and controlled and its affairs conducted in such a manner that it was a mere instrumentality of Central, inasmuch as Central, through Matsuo and other employees, exerted such domination of finances, policies, and practices over Double K that it had no separate mind, will, or existence of its own and merely served as a conduit for Central. Failure to recognize that Central is the alter ego of Double K would sanction a fraud and promote injustice.[16]

■ With respect to the Big Island Contract, we also hold that the trial court's finding that Laupahoehoe was not the alter ego of T & N is clearly erroneous. Although T & N was incorporated well before the Big Island bid request, similarly to Double K, Matsuo was involved in the creation of T & N, providing the money to "start-up" the fledgling corporation. We note that Specification M had been incorporated into DAGS' bids since the 1970s and that section 3.2.1 was incorporated into the new bids because of suspected collusion between Laupahoehoe and T & N.

Laupahoehoe's control over T & N is further evidenced by the fact that Ura, T & N's one hundred percent stock holder, president, and operations manager, contributed no money to T & N's assets and could not recall having performed any work for T & N between 1988 and 1990, the period just prior to the Big Island Contract. Ura also could not recall who prepared or drafted the articles of incorporation even though he signed them.

With respect to T & N's operation, Matsuo and Dayton Oniwa, an employee of Laupahoehoe, calculated and prepared T & N's bid proposal. T & N shared office space with and leased its baseyard from Laupahoehoe. Although Ura possessed sole authority to sign checks, received a salary of $800.00 per month, and had use of the company car, Laupahoehoe retained custody of T & N's checkbook and performed its administrative work—including bookkeeping, accounts payable and receivable, driver payroll, and taxes. T & N also leased its buses from Laupahoehoe, with a standing order for replacement buses in the event of a breakdown. Laupahoehoe serviced, repaired, and fueled all T & N's vehicles, and provided its bus drivers. Upon T & N's being awarded the contract, Matsuo extended loans for T & N's bid guaranties.[17] Finally, although Ura proclaimed that T & N was his company, when asked what he did, with respect to running the company, he defined his position to be that of a janitor or handyman.

With regard to the collusive nature of Laupahoehoe and Matsuo's conduct in simultaneously controlling T & N and Laupahoehoe's bids, George Okano testified:

Q [by Mr. Nakashima]: Was there any other reason that [section 3.2.1] was implemented [to prohibit] a bidder [from] leas[ing] buses to the winning bidder, one bidder?

. . . .

A [by Okano]: Okay, there were previous bids whereby T & N and Laupahoehoe had bid and one of the companies would withdraw their bid if both companies were the low bid, allowing the higher bid to win the award.

Q: What would happen if there was a middle bidder between Laupahoehoe and T & N?

A: Then the lower bidder would accept the award of the contract. I think that just happened once.

. . . .

Q: What did you mean by not fully independent?

---

16. Furthermore, although appellees argued that the leasing of buses to Double K and T & N was conducted in arms-length transactions, appellants adduced evidence showing that Central and Laupahoehoe leased 1981 model buses to Double K and T & N at $150 and $160, respectively, yet leased the same buses to GTI at a rate ranging from $300 to $420.

17. Relying mainly upon a lack of commingled assets, the trial court held that there was insufficient evidence to conclude that Double K and T & N were mere instrumentalities or alter egos of Matsuo, Central and/or Laupahoehoe. *See* FOF No. 117. This lone factor is not dispositive of the issue.

A: Companies that would speculate or [were] suspect[ed] of being affiliated with another company, we'd suspect.

Q: Would that include T & N and Laupahoehoe?

A: T & N, the emergence of T & N did present a lot of suspicion.

Q: Going back to my original question, in that scenario where an affiliated company would bid one amount and the other affiliated company would bid at a higher amount on the same route, what would you describe that as?

A: Unfair.

Q: That's because—why would that be unfair to have affiliated companies bidding high and low?

A: Essentially putting in two bids and selecting according to your advantage.

■ Based on the overwhelming weight of the evidence, we hold that T & N was so organized and controlled and its affairs conducted in such a manner that it was, in fact, a mere instrumentality of Laupahoehoe, inasmuch as Laupahoehoe exerted such domination of finances, policies, and practices of T & N that it had no separate mind, will, or existence of its own and merely served as a conduit for Laupahoehoe.[18]

## 2. Piercing the Corporate Veil

■ We must now determine whether the corporate veil ought to be pierced. Are the plaintiffs, RHSB and STI, asserting a claim against a second corporation or individual, i.e., Matsuo, Laupahoehoe, or Central, upon a cause of action that otherwise would have existed only against the first corporations, i.e., Double K and T & N? Are plain-

tiffs attempting to pierce the corporate veil as a means of imposing liability on an underlying cause of action, such as a tort or breach of contract, incurred solely by the shell corporations? The answer to both of these questions is no.

Appellants complaint is lodged directly against Laupahoehoe, Central, and Matsuo, as well as Double K and T & N. Although we acknowledge that it is the "factual" recognition of the scheme that is necessary to the survival of appellants' claims, such claims survive without this court unnecessarily "piercing the corporate veil." Because, as a factual matter, Matsuo, Laupahoehoe, and Central's control over Double K and T & N touches appellants' statutory and common law claims, we hold that Central and Laupahoehoe are alter egos of Double K and T & N, respectively. Insofar as appellants have maintained their claims directly against Matsuo, Laupahoehoe, and Central, we need not "pierce the corporate veil."

## C. Claims under HRS Chapter 480

■ Appellants contend that Matsuo, Laupahoehoe, and Central "secretly acting in concert" incorporated, controlled, and/or operated Double K and T & N as shell corporations, circumventing DAGS's regulations, to gain unfair competitive advantage for Laupahoehoe and Central and to monopolize the school bus industry in violation of HRS §§ 480–2 and 480–9. Appellees contend, as a threshold matter, that appellants lack standing to obtain relief under HRS §§ 480–2 and 480–13 insofar as the present matter is a private dispute between competing businesses.[19] We agree.

---

18. Although appellants presented evidence that Matsuo was a key figure in the shell scheme, i.e., as 94% owner and C.E.O. of C.M. Holding Corporation, as an officer and director of Laupahoehoe and Central, and as a participant in daily operations, the record supports a conclusion that Matsuo was acting as the owner and leader of the corporations, rather than as their alter ego. The party claiming that a corporation is an alter ego of another bears the burden of proof. See Henry Waterhouse Trust Co., 27 Haw. at 582. Thus, in this regard, we affirm the trial court's findings and conclusions.

19. Appellees also contend that appellants' HRS § 480–2 claims fail because appellees are shielded by the doctrine of "state action immunity." The "state action immunity" doctrine provides that losing bidders are barred from bringing antitrust claims against either the agency or successful bidder, where the state has exclusive control of a bidding process and creates a monopoly by awarding all contracts to one successful bidder. See Buckley Constr., Inc. v. Shawnee Civ. & Cultural Dev. Auth., 933 F.2d 853 (10th Cir.1991). The challenging bidder must show that: (1) "the challenged behavior is sanctioned by a clearly articulated and affirmatively expressed state policy;" and (2) "the state expressly supervises the

1. *Standing to Assert Unfair Methods of Competition under HRS §§ 480–2 and 480–13*

Reading the statutory language of HRS §§ 480–2 and 480–13 *in pari materia,* this court, in *Ai v. Frank Huff Agency, Ltd.,* 61 Haw. 607, 612, 607 P.2d 1304, 1308–09 (1980), and *Island Tobacco Co. Ltd. v. R.J. Reynolds Tobacco Co.,* 63 Haw. 289, 296–97, 627 P.2d 260, 266 (1981), held that HRS § 480–13 affords a private remedy for any violation of HRS § 480–2.[20] However, both *Ai* and *Island Tobacco Co.* involved claims of unfair or deceptive acts or practices, *not* unfair methods of competition. The following explains why we must revisit the overly broad holdings of both *Ai* and *Island Tobacco Co.* and restrict their application to unfair or deceptive acts or practices claims.

As recognized in *Island Tobacco Co.,* 63 Haw. at 296–97, 627 P.2d at 266, HRS Chapter 480 was first enacted "in 1961 to fill a vacuum created by the advent of statehood." Prior to statehood, federal antitrust laws applied to trade in Hawaii as a territory of the United States. *See id.* "[W]hen the state legislature undertook the task of fashioning Hawaii's antitrust law, it logically followed the federal paradigm." *Id.* For example, HRS § 480–4 (1993), which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[,]" traces, verbatim, the language of Section 1 of the Sherman Antitrust Act, 26 Stat. 209, *as amended,* 15 U.S.C. § 1.[21] Similarly, HRS § 480–9 (1985 & Supp. 1992) provides that "[n]o person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce," tracing Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.[22]

private anticompetitive conduct at issue." *Lease Lights, Inc. v. Public Serv. Co. of Oklahoma,* 849 F.2d 1330, 1333 (10th Cir.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 807 (1989) (citing *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985)); *see also California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 104–06, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* & 221, at 357 (rev. ed.1997). Appellees defense in this regard is meritless. It is patently obvious that DAGS intended to *foster* competition. Without addressing the state immunity doctrine in greater depth, we have serious reservations that it would apply to shield a successful bidder where there is evidence that such bidder attempted to deceive a state agency concerning its independence from another bidder in order to circumvent bidding rules.

Appellees also adduced considerable evidence at trial to prove that RHSB and STI had unclean hands. It is well settled that the unclean hands defense is precluded in HRS § 480–13 claims for monetary damages. *See Davis v. Wholesale Motors, Inc.,* 86 Hawai'i 405, 417–18, 949 P.2d 1026, 1038–39 (App.1997) (citing *International Tel. and Tel. Corp. v. General Tel. & Elecs. Corp.,* 296 F.Supp. 920, 926 (D.Haw.1969)). "The U.S. Supreme Court has explained that 'the plaintiff who reaps the reward of treble damages [in an antitrust suit] may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition.'" *Id.* (citing *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 765–66, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)) (footnote omitted).

20. *See also Paulson, Inc. v. Bromar, Inc.,* 775 F.Supp. 1329, 1338 (D.Haw.1991).

21. In 1890, the Sherman Antitrust Act was enacted to target unreasonable restraints of trade and was intended to codify well recognized principles of the common law. *See* 2 Philip R. Areeda & Herbert Hovenkamp, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* & & 302–3, at 2–7 (rev. ed. 1997) (*Areeda & Hovenkamp*). Section 1 of the Sherman Antitrust Act provides in part: "**Trusts, etc., in restraint of trade illegal; penalty.** Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal...."

22. Section 2 of the Sherman Antitrust Act provides:

**Monopolizing trade a felony; penalty.** Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

HRS § 480–13(a)(1) (Supp.1992) was also included within the 1961 enactment and permits any person[23]

> who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter ... [to] ... sue for damages sustained by the person, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is greater, and reasonable attorneys fees together with the costs of suit....

*See also* 6 Julian von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 111.07, at 111–18 (2d ed. 1998) (*Von Kalinowski on Antitrust*). HRS § 480–13 traces the language of Section 4 of the Clayton Act, 38 Stat. 731, *as amended,* 15 U.S.C. § 15,[24] which provides a private cause of action for violations of the antitrust laws, namely the substantive provisions of the Sherman and Clayton Acts.

Hawaii's antitrust law, currently found within HRS Chapter 480, was amended in 1965 to include:

> Sec. 205A–1.1. **Unfair competition, practices, declared unlawful.** Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

> Sec. 205A–1.2. **Interpretation.** It is the intent of the legislature that in construing section 205A–1.1 the courts *will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1)[25] of the Federal Trade Commission Act."*

1965 Haw. Sess. L. Act 129, § 1, at 176–77 (emphasis and footnote added). HRS § 480–2 was again amended in 1980 to slightly change the guidance language of Section 480–2(b) and in 1987 to add sections 480–2(c) and (d) (Supp.1992). The amendments provided:

> (b) In construing this section, the courts and the office of consumer protection *shall give due consideration* to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

> (c) *No showing that the proceeding or suit would be in the public interest* (as these terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary in any action brought under this section.

> (d) *No person other than a consumer,* the attorney general or the director of the office of consumer protection may bring an action based upon *unfair or deceptive acts or practices* declared unlawful by this section.

(Emphases added.)

■ Whether we are "guided by the interpretations of" or "give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1)," it is apparent that the private remedy provision contained in section 4 of the Clayton Act does not extend to Section 5(a)(1) of the FTCA,

---

**23.** "Person," as defined by HRS § 480–1 (1985 & Supp.1992), includes a corporation.

**24.** Enacted in 1914, the Clayton Act was targeted at activities which substantially lessened competition, providing more specific proscriptions to antitrust legislation, as well as a private remedies provision. *See* 2 *Areeda & Hovenkamp, supra,* & 303, at 2–10. Section 4 of the Clayton Act provides in relevant part:

> **Suits by persons injured.** (a) Amount of recovery; prejudgment interest[.] Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee....

**25.** Section 5 of the Federal Trade Commission Act, 38 Stat. 719, *as amended,* 15 U.S.C. § 45 (FTCA) provides in relevant part: "**Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade.** (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

*i.e.,* the "unfair methods of competition" section, and that the FTCA does not afford a private cause of action. *See Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 306, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); *Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 703 n. 12, 68 S.Ct. 793, 92 L.Ed. 1010, *reh' g denied,* 334 U.S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764 (1948); *Amalgamated Utility Workers v. Consolidated Edison Co. of New York, Inc.,* 309 U.S. 261, 269, 60 S.Ct. 561, 84 L.Ed. 738 (1940); *Federal Trade Commission v. Klesner,* 280 U.S. 19, 25–30, 50 S.Ct. 1, 74 L.Ed. 138 (1929); 2 Philip R. Areeda & Hebert Hovenkamp, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* & 305a, at 15 (rev. ed.1997) (hereafter *Areeda & Hovenkamp* ). In 1914, the FTCA was enacted to supplement the Sherman Act, 15 U.S.C. §§ 1 to 7, and the Clayton Act, 15 U.S.C. §§ 12 to 27, by empowering the FTC with cumulative remedies against activities detrimental to competition. *See Federal Trade Commission v. Raladam Co.,* 283 U.S. 643, 647–48, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); *Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 690–93, 68 S.Ct. 793, 92 L.Ed. 1010, *reh' g denied,* 334 U.S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764 (1948); *Federal Trade Commission v. Motion Picture Advertising Serv. Co.,* 344 U.S. 392, 394, 73 S.Ct. 361, 97 L.Ed. 426, *reh' g denied,* 345 U.S. 914, 73 S.Ct. 638, 97 L.Ed. 1348 (1953). In fact, the legislative history to the FTCA provided:

> It is now generally recognized that the only effective means of establishing and maintaining monopoly, where there is no control of a natural resource ... [without the use] of transportation, is the use of unfair competition. The most certain way to stop monopoly at the threshold is to prevent unfair competition. *This can be best accomplished through the action of an administrative body of practical men thoroughly informed in regard to business, who will be able to apply the rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations.*

> It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country. Whether competition is unfair or not generally depends upon the surrounding circumstances. What is harmful under certain circumstances may be beneficial under different circumstances.

H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., at 18–19 (1914) (brackets and emphasis added); *see also* 2 *Areeda & Hovenkamp, supra,* & 305a, at 12. Section 5 was amended in 1938 to extend the FTC's jurisdiction to "unfair or deceptive acts or practices." *Id.* & 305c, at 13 n. 4. Therefore, Congress enacted section 5 of the FTCA to combat activities in their incipiency that exhibit a strong potential for stifling competition. *See Federal Trade Commission v. Texaco,* 393 U.S. 223, 225, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968).

▄▄▄ It is commonly understood that section 5 is not limited to "the prohibitions of the Sherman or the Clayton Act. Indeed, [section] 5 is not confined by antitrust concepts at all. It allows the Commission to condemn conduct that is 'unfair' in senses 'beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.'" *Areeda & Hovenkamp, supra,* & 307a, at 21–22 (brackets added); *see also Federal Trade Commission v. Indiana Federation of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). In other words, the FTC, as an agency acting within its field of expertise, administers and enforces section 5 of the FTCA to terminate conduct that it deems to have a strong potential of reducing or eliminating legitimate competition in the future.

In light of the decisions of the FTC and federal interpretations of section 5(a)(1) of the FTCA, the statutory language of HRS § 480–2 is ambiguous. We must, therefore,

look to the legislative history of HRS § 480–2 for further guidance.

The 1965 legislative history underlying HRS § 480–2 includes the following:

H.B. No. 136 would amend the Hawaii Antitrust Act by adding a new section declaring unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. *The purpose of the bill is to provide the Attorney General with much needed authority to bring proceedings to enjoin unfair and deceptive business practices by which consumers are defrauded and the economy of the State is harmed.*

There has been established in the Attorney General's Office of a Fair Business Practices Division. That division has been assigned the responsibility for developing and administering an effective fair business program to protect both consumers and honest businessmen from fraudulent, unfair or deceptive business practices. The authority to stop and prevent practices of this nature, which H.B. No. 136 would provide, is essential to an effective fair business program.

. . . .

*The Hawaii Antitrust Act now contains appropriate enforcement provisions, including authority to the Attorney General to bring proceedings to enjoin any violations of the provisions of the act. The amendment of the act, as provided by H.B. 136, would make all of its enforcement provisions, except the criminal provisions, applicable to the amendment.*[26] *Primarily, as indicated above, it would empower the Attorney General to maintain suits to enjoin the continuation of unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce.*

. . . .

Hse. Stand. Comm. Rep. No. 55, in 1965 House Journal, at 538 (emphases and footnote added); *see also* Hse. Stand. Comm. Rep. No. 267, in 1965 House Journal, at 599–600 ("H.B. No. 136 would authorize the Attorney General to seek an injunction from the courts against continuing particular practices.").

The legislative history relating to the 1987 amendment also stated in relevant part:

The purposes of this bill were to establish definitions of "class action" and "de facto class action" and to make several amendments to Chapter 480, Hawaii Revised Statutes, including the following:

(1) Provided that the $1,000 minimum recovery provision is only applicable to consumer suits based upon unfair or deceptive practices brought under Section 480–2, unfair and deceptive practices;

. . . .

(5) Provided that suits based upon unfair or deceptive acts or practices under Section 480–2 may be brought only by consumers, the Attorney General, or the Office of Consumer Protection, *in effect precluding its application to private disputes between businessmen.*

Your Committee finds that current law is unclear and the procedure confusing. Upon further consideration, your Commit-

**26.** This court, in *Ai,* 61 Haw. at 612 n. 10, 607 P.2d at 1309 n. 10, interpreted this language as establishing conclusively the legislature's intent to create a private cause of action for all violations of Section 480–2. However, as noted above, *Ai* entailed an unfair or deceptive acts or practices claim, not an unfair methods of competition claim. Furthermore, the *Ai* court cited, among other cases, *Radovich v. National Football League,* 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456, *reh' g denied,* 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724 (1957), which is inapposite to private enforcement of unfair competition claims. *Radovich,* 352 U.S. at 446–47, 77 S.Ct. 390, involved violations of sections 1 and 2 of the Sherman Antitrust Act, which fall squarely within the private enforcement measures of section 4 of the Clayton Act—unlike section 5 of the FTCA. What is most telling is that (1) nearly all of the legislative history relating to HRS § 480–2 focuses upon consumer protection through unfair or deceptive acts or practices and (2) there is no discussion of the effects that recognizing a private claim for unfair competition would have on competition—when protecting competition is one of the fundamental purposes of antitrust legislation. This leads us to conclude that the legislature did not intend to extend HRS § 480–13 to unfair methods of competition claims. Insofar as *Ai,* 61 Haw. at 612, 607 P.2d at 1308–09, holds that a private cause of action exists for unfair methods of competition under HRS § 480–2, it is overruled.

tee has made numerous amendments to the bill including the following:

. . . .

2. *Amended Section 480–2*, Hawaii Revised Statutes, *by requiring that the court and Office of Consumer Protection shall be guided by rules, regulations, and decisions of the Federal Trade Commission and the federal court[s]* and by providing that it shall not be necessary to show that the proceeding or suit brought under this section would be in the public interest and *that no other person other than a consumer, the Attorney General or the director of the Office of Consumer Protection may bring an action under this section. The amendment to Section 480–2 is intended to clarify actions of unfair and deceptive acts and is not intended to affect suits based upon unfair methods of competition*

. . . .

Hse. Conf. Comm. Rep. No. 104, in 1987 House Journal, at 1053 (emphases added). Additional legislative history states:

. . . .

Your Committee has received testimonies from attorneys who have litigated in this area of law.

Presently, Chapter 480 has been interpreted by some courts as allowing individual plaintiffs who can prove that they have been injured because of an antitrust violation to recover a minimum amount of $1,000 regardless of the actual amount of damages sustained. Other courts have decided differently. The applicable penalties provisions require classification. *When this law was enacted, the Legislature did not intend to impose draconian measures upon defendants in the guise of enforcing our antitrust laws . . . .*

Hse. Stand. Comm. Rep. No. 575, in 1987 House Journal, at 1371 (emphasis added).

We *now* interpret the legislative history to the 1965 and 1987 amendments *not* to recognize or create a private claim for relief under HRS § 480–13 for unfair methods of competition in violation of HRS § 480–2.[27] This interpretation in no way limits consumer claims for unfair or deceptive acts or practices under HRS § 480–2 or, *inter alia,* private claims for violations of HRS §§ 480–4 or 480–9. The Hawaiʻi legislature has made clear pronouncements on these claims, either through the statutory language of HRS § 480–2(d) or through the guidance of similar federal antitrust statutes as permitted in HRS § 480–3.

In a similar vein, the United States Court of Appeals for the Ninth Circuit succinctly stated that

[i]t is a simple but important truth . . . that our antitrust laws are designed to protect the integrity of the market system by assuring that competition reigns freely. While much has been said and written about the antitrust laws during the last century of their existence, ultimately the court must resolve a practical question in every . . . [antitrust] case: Is this the type of situation where market forces are likely to cure the perceived problem within a reasonable period of time? Or, have barriers been erected to constrain the normal operation of the market, so that the problem is not likely to be self-correcting? In the latter situation, it might well be necessary for a court to correct the market imbalance; in the former, a court ought to exercise extreme caution because judicial intervention in a competitive situation can

---

**27.** This court, in *Island Tobacco Co.*, 63 Haw. at 301, 627 P.2d at 269, stated that HRS § 480–2 is

designed to aid "competitors," as much as to protect "competition." And unlike the Federal Trade Commission Act, the policy of Hawaii law, as expressed in HRS § 480–13, is to foster private suits grounded on unfair or deceptive trade practices even where the unlawful acts [d]o not culminate in injury to "competition." *See id.* at 301 n. 12, 627 P.2d at 269 n. 12 (citing Hse. Standing Comm. Rep. No. 735–74, in 1974 House Journal 829, 830; Sen. Stand. Comm. Rep. No. 703–74, in 1974 Senate Journal 1020,

1021). As noted above, *Island Tobacco Co.* did not involve an unfair methods of competition claim. Furthermore, because the legislature specifically limited a competitor's ability to bring an unfair or deceptive acts or practices claim to consumers, *see* HRS § 480–2(d); *Cieri v. Leticia Query Realty, Inc.,* 80 Hawaiʻi 54, 61–62, 905 P.2d 29, 36–37 (1995), we do not regard *Island Tobacco Co.* as being dispositive on this issue. Insofar as *Island Tobacco Co.,* 63 Haw. at 301, 627 P.2d at 269, holds that a private cause of action exists for unfair methods of competition under HRS § 480–2, it is also overruled.

itself upset the balance of market forces, bringing about the very ills the antitrust laws were meant to prevent. *See* R. Coase, *The Firm, The Market, and the Law* 117–19 (1988); R. Posner, *Economic Analysis of Law* 324–25, 338–39 (3d ed.1986).

*United States v. Syufy Enterprises*, 903 F.2d 659, 663 (9th Cir.1990) (addressing claims under the Sherman Antitrust Act) (brackets added).

As one might guess, the broad and flexible language of HRS § 480–2 could prove to have deleterious effects on competition when used as an instrument by private plaintiffs with predominantly private interests. *See Holloway v. Bristol–Myers Corp.*, 485 F.2d 986, 989–91 (D.C.Cir.1973) ("the breadth of prohibition carried with it a danger that the [FTCA] might become a source of vexatious litigation" (Brackets added.)). Indeed, we must be careful to avoid constructions of HRS § 480–2 "which might chill competition, rather than foster it." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also Syufy Enterprises*, 903 F.2d at 668 ("It can't be said often enough that the antitrust laws protect competition, not *competitors*." (emphasis in original)); *but see Cel–Tech Communications Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 560–565, 973 P.2d 527 (1999) (clarifying California's Unfair Competition Statute, Bus. & Prof.Code, § 17200, *et seq.*, which recognizes private standing); *Inka's S'Coolwear, Inc. v. School Time, L.L.C.*, 725 So.2d 496, 501 (La.Ct.App.1998) (recognizing an existing private action for unfair trade practices).

Therefore, because the fundamental purpose underlying the FTCA is to empower the FTC with the authority to prevent activities that have the strong potential for lessening or destroying competition and because the legislative history of HRS § 480–2 establishes that the primary purpose of its insertion into HRS Chapter 480 is to empower the Fair Business Practices Division of the Department of the Attorney General with the means and authority to do the same, we hold that there is no private claim for relief under HRS § 480–13 for unfair methods of competition in violation of HRS § 480–2. Given the danger of chilling competition and suppressing legitimate business innovations, we decline to deviate from the distinct and well understood statutory policy of section 5(a)(1) of the FTCA, in the absence of a clear pronouncement on the part of the Hawai'i legislature.

### 2. *Violations of HRS § 480–9*

Appellants contend that the trial court erred in (1) holding that there was insufficient evidence to conclude that appellees attempted to monopolize the school bus industry and (2) employing a retrospective rather than a prospective test in its analysis of the dangerous probability of success. Although we agree with appellants that the trial court erred in relying solely on appellees' lack of subsequent market success, we affirm the trial court's conclusion that there was insufficient evidence to support appellees' attempt to monopolize claim.

As a threshold matter, we must address the form of appellants' claim. Appellants alleged in their complaint that appellees *conspired* [28] to monopolize the school bus industry. Prior to and during trial, appellants conceded that the facts of the case supported an attempt to monopolize claim rather than an actual monopolization claim. We assume that appellants were attempting to allege a concerted attempt to monopolize. Such an allegation implicates both HRS §§ 480–4(a) (1993) and 480–9.[29]

---

**28.** Generally speaking, "the accepted definition of a conspiracy is a combination of two or more persons [or entities] by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 466, 41 S.Ct. 172, 65 L.Ed. 349 (1921) (citation omitted); *see also Island Tobacco Co. v. R.J. Reynolds Tobacco Co.*, 513 F.Supp. 726, 739

(D.Haw.1981); *Bonds v. Landers*, 279 Or. 169, 566 P.2d 513, 516 (1977) (citing 15A C.J.S. 599 *Conspiracy* § 1(2)).

**29.** HRS § 480–4, like section 1 of the Sherman Act, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State[,] is illegal." HRS § 480–9, like section 2 of the Sherman Act, also

In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768–773, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the United States Supreme Court explained the distinction between unilateral and concerted conduct for purposes of a single firm under section 1 of the Sherman Act. Focusing upon the singular nature of economic interests within a single firm, the Court stated that is it clear that officers or employees, as well as unincorporated divisions, of the same corporation or business cannot provide the plurality of actors necessary for a section 1 conspiracy. *Id.* at 769–770, 104 S.Ct. 2731. Similarly,

> the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousness, but one....
>
> Indeed, the very notion of an "agreement" in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning. A § 1 agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)....

*Id.* at 772, 104 S.Ct. 2731.

Previously, we have held that Central and Laupahoehoe are alter egos of Double K and T & N, respectively. It would be wholly inconsistent to hold that Double K and Central or T & N and Laupahoehoe could constitute a plurality of actors for purposes of a conspiracy whether construed under HRS §§ 480–4 or 480–9. *See Ulrich v. The Security Investment Co., Ltd.*, 35 Haw. 158, 167 (1939) (stating that it is "impossible" to conspire with an alter ego). Moreover, inasmuch as Laupahoehoe and Central are two wholly owned subsidiaries of the same parent, C.M. Holding Corporation, and inasmuch as they share a singular economic interest (akin to unincorporated divisions of the same corporation), they cannot constitute a plurality of actors for purposes of antitrust conspiracy. *See* 7 Philip Areeda, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* & & 1463h and 1464a, at 230–233 (1986). In fact, testimony was adduced that Laupahoehoe and Central were perceived as one and the same company. Thus, Laupahoehoe and Central cannot conspire in violation of HRS §§ 480–4 or 480–9.

Furthermore, Matsuo was also unable to conspire for purposes of HRS §§ 480–4 or 480–9. Matsuo was an officer of Laupahoehoe and Central during the relevant time period. It is well recognized that an officer of a corporation cannot conspire with the corporation. *See Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). Nevertheless, we recognize that, "when officers of a corporation act for their own personal purposes, they become independent actors, who can conspire with the corporation." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir.1981) (cited in *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 757 P.2d 105, 110 (Ct.App.1988), and *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999)). However, here, Matsuo was also the 94% owner of C.M. Holding Corporation (with his daughters owning the remaining six percent). Insofar as the facts reveal that Matsuo's economic interest, with regard to this case, was the same as that of Laupahoehoe and Central, we hold that Matsuo could not conspire for purposes of HRS §§ 480–4 or 480–9

---

condemns those who "combine or conspire ... to monopolize." "The prohibition is curious because, given § 1, it seems entirely redundant." 3A *Areeda & Hovenkamp, supra*, & 809, at 370. A conspiracy in violation of HRS § 480–9 requires the same proof needed to prove a combi-nation or conspiracy in restraint of trade under HRS § 480–4. *See International Distrib. Centers v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) (addressing sections 1 and 2 of the Sherman Act).

■ Turning to appellants' claims under HRS § 480–13(a),[30] in order to have standing to bring a claim for relief, a plaintiff must show: (1) a violation of HRS Chapter 480; (2) injury to plaintiff's business or property;[31] (3) proof of the amount of damages;[32] and (4) a showing that the action is in the public interest.[33] *See Ai*, 61 Haw. at 612, 607 P.2d at 1311. The following reveals that appellants' claim fails because they failed to prove a violation of HRS Chapter 480.

■ An attempt to monopolize claim, under HRS § 480–9, requires proof: (1) that the defendant has engaged in predatory or anticompetitive conduct with; (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc.*, 506 U.S. at 456, 113 S.Ct. 884 (citation omitted); *Bartleys Town and Country Shops, Inc.*, 530 F.Supp. at 512 (placing antitrust injury element within attempt test rather than within elements for relief under Clayton Act, § 4); 1 *Von Kalinowski on Antitrust, supra*, § 2.03[2], at 2–23 to 2–14.

■ With respect to the element of predatory or anticompetitive conduct, appellants have alleged that appellees engaged in unfair competition in their circumvention of DAGS's

**30.** It has been argued that section 480–13(a) is an automatic damages provision. The plain language of HRS § 480–13(a), however, requires some evidence of damage. Indeed, "[w]hile proof of a violation of chapter 480 is an essential element of an action under HRS § 480–13, the mere existence of a violation is not sufficient ipso facto to support the action; forbidden acts cannot be relevant unless they cause [some] private damage." *Ai*, 61 Haw. at 618, 620–21, 607 P.2d at 1312, 1313 (citing E. Timberlake, *Federal Treble Damage Antitrust Actions* § 3.04 (1965)) (brackets added); *see also*, 4 Rudolph Callmann, *Unfair Competition, Trademarks and Monopolies*, § 22.03, at 10–13 (4th ed.1997); Sen. Stand. Comm. Rep. No. 600, in 1969 Senate Journal, at 1111 (Hawai'i legislature amended HRS § 480–13 to provide a minimum $1,000 award to encourage private consumers to bring unfair or deceptive acts or practices suits).

**31.** It is not clear whether the trial court viewed the elements of (1) resulting injury to business or property and (2) damages as one and the same. These are two distinct elements of HRS § 480–13. Indeed, federal case law has interpreted the "injury to business or property" language of section 4 of the Clayton Act as a causation requirement, requiring a showing of "antitrust injury." "Plaintiffs must prove ... [an] injury of the type the antitrust laws were intended to prevent[, one] ... that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the 'type of loss' that the claimed violations ... would be likely to cause." *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (citation omitted); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Pacific Exp., Inc. v. United Airlines, Inc.*, 959 F.2d 814, 818 (9th Cir.1992), *cert. denied*, 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992); 1 *Callmann on Unfair Competition, supra*, § 4.47, at 433–36.

Also known as the "fact of damage" requirement, the antitrust plaintiff need not prove with particularity the full scope of profits that might have been earned. Instead, it requires a showing, with some particularity, of actual damage caused by anticompetitive conduct that the antitrust laws were intended to prevent. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 113, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *William Inglis & Sons Baking Co. v. Continental Baking Co., Inc.*, 942 F.2d 1332, 1339–40 (9th Cir.1991), *aff'd in part and rev'd in part*, 981 F.2d 1023 (9th Cir.1992).

**32.** In contrast to the "fact of damage" requirement, the damages element of section 480–13(a) is the "amount of damage." *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–67, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir.1985) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946), *reh'g denied*, 327 U.S. 817, 66 S.Ct. 815, 90 L.Ed. 1040 (1946)). The plaintiff must present "sufficient evidence to permit 'a just and reasonable estimate of the damages[,]'" *William Inglis & Sons Baking Co.*, 942 F.2d at 1340; *see also Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990), such that "the [trier of fact] is not left to 'speculation or guesswork' in determining the amount of damages to award." *Dolphin Tours, Inc.*, 773 F.2d at 1509–10 (citing *Bigelow*, 327 U.S. at 263–65, 66 S.Ct. 574); *see also Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir.1986); *Houston Mercantile Exchange Corp. v. Dailey Petroleum Corp.*, 930 S.W.2d 242, 248 (Tex.Ct.App. 1996); 4 *Callmann on Unfair Competition, supra*, § 22.51, at 443–46.

**33.** The public interest requirement is not required for consumer claims of unfair or deceptive acts or practices. *See* HRS § 480–2(c).

bidding rules and regulations in order to bid on contracts and lease buses simultaneously. Although appellants do not have standing to bring an unfair methods of competition claim under HRS § 480–2, we agree that appellees' conduct constitutes unfair competition [34] for purposes of an attempt to monopolize claim. However, for appellants' claim to succeed, "[i]t must also appear that there is a causal connection between the conduct and the monopoly power." 3A *Areeda & Hovenkamp, supra,* & 806c, at 330.

Regarding the element of a specific intent to monopolize, one must do more than show that the defendant had the specific intent "to prevail over one's rivals." 3A *Areeda & Hovenkamp, supra,* & 805a, at 322–23. One must show that the defendant desired, for example, "to achieve monopoly power, to accomplish a forbidden monopoly,[35] . . . or to exclude competition." *Id.* (some footnotes omitted and some added). Although anticompetitive conduct may supply sufficient inference of this necessary intent, *see generally Spectrum Sports, Inc.,* 506 U.S. at 454–56, 113 S.Ct. 884; *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Systems, Inc.,* 491 F.Supp. 1199, 1218 (D.Haw. 1980), *aff' d,* 732 F.2d 1403 (9th Cir.1984), intent alone is insufficient to establish a dangerous probability of success. *See Swift & Co. v. United States,* 196 U.S. 375, 402, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

With respect to the third and final element, an attempt to monopolize claim "includes activities embodying 'the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it.' " *Bartleys Town and Country Shops, Inc.,* 530 F.Supp. at 511 (citing *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc.,* 506 U.S. at 456, 113 S.Ct. 884 (brackets added). "There is universal agreement that monopoly power is the power to exclude competition or control prices." *Syufy Enterprises,* 903 F.2d at 664 (citing *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). "The existence of such power ordinarily may be inferred from [a] predominant share of the market." *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

When looking at appellees' share of the relevant market (which can be viewed as either several county markets or one state market), appellants urge this court to apply

**34.** Although HRS § 480–2 does not define unfair competition, it "was constructed in broad language in order to constitute a flexible tool to stop and prevent [unfair competition and] fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen and businesswomen." *Han v. Yang,* 84 Hawai'i 162, 177, 931 P.2d 604, 619 (App.1997) (quoting *Ai,* 61 Haw. at 616, 607 P.2d at 1311) (footnote omitted) (some brackets added and some omitted); *see also* 6 *Von Kalinowski on Antitrust, supra,* § 111.07, at 111–18; 1 *Callmann on Unfair Competition, supra,* § 2.08, at 27–28; *Restatement (Third) of the Law of Unfair Competition* § 1, cmt. g, at 9–11 (1995). Generally speaking, competitive conduct "is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 51, 919 P.2d 294, 313 (1996) (citations and brackets omitted). Further, section 5 of the FTCA specifically dictates that it is an unfair method of competition to violate specific trade regulations, to attempt to circumvent antitrust statutes, or to engage in practices that "violate the spirit of antitrust laws." *Island Tobacco Co. v. R.J. Reynolds Industries Inc.,* 513 F.Supp. 726, 737 (D.Haw. 1981); *see also Cel–Tech Communications Inc.,* 83 Cal.Rptr.2d at 560–565, 973 P.2d 527 ("[T]he word 'unfair' . . . means conduct that [(1)] threatens an incipient violation of an antitrust law, or [(2)] violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or [(3)] otherwise significantly threatens or harms competition." (Brackets added.)).

**35.** "Monopoly exists when one firm controls all or the bulk of a product's output, and no other firm can enter the market, or expand output, at comparable costs." 2A Philip Areeda, Herbert Hovenkamp, & John Solow, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* & 403a, at 5 (1995).

a prospective rather than a retrospective test, *i.e.*, appellants urge this court to examine *only* appellees' market share at the time appellees created and submitted bids through Double K and T & N to determine whether a "dangerous probability" existed.[36] Appellees counter that subsequent market performance, *i.e.*, appellees' subsequent loss of market share, "is highly relevant in establishing that the defendant lacked the necessary power to raise prices or exclude competition." We agree with appellees that subsequent performance is relevant and admissible; however, subsequent market performance is not dispositive. *See Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270–71 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) ("A subsequent failure to achieve monopoly status cannot itself vitiate a claim of attempted monopoly where other evidence substantially supports the attempt without eviscerating the entire attempt offense.") (citing *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir.1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972)); *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.*, 614 F.2d 832 (2d Cir.1980); *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.*, 651 F.2d 122, 128 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1119 (5th Cir.1984), *reh' g denied*, 756 F.2d 882 (5th Cir.), *cert. dismissed*, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985) (applying prospective test); *Greyhound Computer Corp., Inc. v. International Bus. Mach. Corp.*, 559 F.2d 488, 496 n. 18 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (declining market share may reflect lack of power but not foreclose a finding of power); *Winter Hill Frozen Foods & Serv. Inc. v. Haagen–* *Dazs Co., Inc.*, 691 F.Supp. 539, 547 (D.Mass.1988).

▌ At the time of the alleged violations, Central maintained 78.7% of the Oahu market and Laupahoehoe maintained 63.8% of the Big Island market.[37] By 1993, their shares had declined to 3.2% on Oahu, 51% on the Big Island, and 16.9% throughout the state. During the same time period, RHSB's share of the Oahu market had increased from zero to 39.9% and from 14% to 33.5% throughout the state. Insofar as the trial court might have focused *solely* upon appellees' loss of market share, the trial court erred. This, however, does not rescue appellants' claim. Although a predominant share of the relevant market is indirect evidence of monopoly power, the mere existence of a predominant share of the market, alone, does not equal the power to control prices or exclude competition. *See* 3A *Areeda & Hovenkamp, supra*, & 807e1, at 358 ("To be sure, market share is only an imperfect proxy for market power.").

> Time after time, we have recognized this basic fact of economic life: A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendants' inability to control prices or exclude competitors.

*Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) (citation omitted). *See also Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981) ("Blind reliance upon market share, divorced from commercial reality, [can] give a misleading picture of a firm's actual ability to control

**36.** Appellants rely upon *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 988–89, *reh' g denied*, 716 F.2d 901 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). The United States Court of Appeals for the Fifth Circuit disavowed *Multiflex, Inc.* in *Deauville Corp. v. Federated Department Stores Inc.*, 756 F.2d 1183, 1192 n. 5 (5th Cir.1985), insofar as it conflicts with *Northwest Power Products v. Omark Industries*, 576 F.2d 83, 90 (5th Cir.), *reh' g denied*, 579 F.2d 643 (1978), *cert.*

*denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979) (holding that to prove an antitrust violation under the rule of reason the plaintiff must show defendants' conduct actually adversely affected competition).

**37.** We decline to adopt a bright line rule, at this time, regarding a minimum market share necessary for an attempt to monopolize claim. *See* 3A *Areeda & Hovenkamp, supra*, & 807d, at 353–55.

prices or exclude competition."). There is nothing magic about this proposition; it is simple common sense, embodied in the Antitrust Division's own Merger Guidelines:

> If entry into a market is so easy that existing competitors could not succeed in raising price for any significant period of time, the Department is unlikely to challenge mergers in that market.

*Antitrust Policies and Guidelines,* U.S. Dep't of Justice, Merger Guidelines § 3.3, *reprinted in* 4 Trade Reg. Rep. (CCH) & 13,103 at 20,562 (1988).

*Syufy Enterprises,* 903 F.2d at 664 (brackets in original) (footnote omitted); *see also* 2A Philip Areeda, Herbert Hovenkamp, & John Solow, *Antitrust Law, An Analysis of Antitrust Principles and Their Application* & 420b, at 59 (1995).

Here, the trial record does *not* support a finding that Central or Laupahoehoe had the power to control prices or exclude competition. Although appellees controlled an unusually large share of the school bus markets, the record reveals that there were absolutely no barriers to entry, except those minimally imposed by the state through the bidding process. Moreover, the record shows that no barriers to competition were created by appellees' corporate shell scheme. Three independent competitors, unrelated to appellees (GTI, Gomes, and Bragado), successfully bid on the majority of school bus routes and/or groups contained in the instant bid solicitations. The record

also reveals that, although appellees adduced evidence that Laupahoehoe and T & N had engaged in "bid rigging" in the past, appellees' corporate shell scheme apparently proved unsuccessful to control bid prices in the instant case. Appellants have failed to adduce evidence of a causal connection between appellees' "anticompetitive" conduct and appellees' alleged monopoly power. We, therefore, affirm the trial court's conclusions that there was insufficient evidence to show a dangerous probability of success in the relevant county or state school bus markets in order to sustain appellants' attempt to monopolize claim.

**D. Tortious Interference with Prospective Business Advantage**

▇▇▇▇▇ Appellants claim that the trial court erred (1) in determining that there was insufficient evidence to find or conclude that appellees tortiously interfered with RHSB and STI's prospective business advantages with DAGS and (2) in concluding that appellees' actions were not designed to interfere with RHSB's business relationship with DAGS. Appellants also contend that the trial court erred insofar as it failed to enter any findings or conclusions with respect to the Oahu Contract. With regard to the Oahu Contract we agree, and we also acknowledge that this court has not yet definitively recognized the intentional tort of tortious interference with prospective business advantage.[38] We do so now.[39]

---

**38.** *See Lesser v. Boughey,* 88 Hawai'i 260, 264 n. 3, 965 P.2d 802, 806 n. 3 (1998); *Kutcher v. Zimmerman,* 87 Hawai'i 394, 399 n. 8, 405 n. 15, 957 P.2d 1076, 1081 n. 8, 1087 n.15 (App.1998).

**39.** Appellees contend that a claim of tortious interference with prospective business advantage cannot be maintained within a state bidding framework. We disagree. DAGS encouraged competition in the instant bidding process. Because the former Chapter 103 did not limit private remedies, we hold that appellants' claim of tortious interference is viable. *See Hoefer v. Wisconsin Education Ass'n Ins. Trust,* 470 N.W.2d 336, 341–42 (Iowa 1991) (implicitly recognizing viability of tortious interference with prospective business advantage in state bidding system); *Polote Corp. v. Metric Constructors, Inc.,* 880 F.Supp. 836, 847–48 (S.D.Ga.1995) (same); *cf. Kahn v. Salomon Brothers Inc.,* 813 F.Supp. 191, 195–96 (E.D.N.Y.1993) (holding that violation of

state bidding rules promulgated by press release does not constitute improper conduct to support tortious interference claim). We decline to decide whether this claim is viable under HRS § 103D–704 (1993).

Appellees cited several cases in support of their argument. *See Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); *Coyne–Delany Co., Inc. v. Capital Dev. Bd. of State of Illinois,* 616 F.2d 341 (7th Cir.1980); *Sowell's Meats and Services, Inc. v. McSwain,* 618 F.Supp. 140 (D.S.C.1985) *aff' d,* 788 F.2d 226 (4th Cir.1986); *ARA Services, Inc. v. School Dist. of Philadelphia,* 590 F.Supp. 622 (E.D.Pa.1984) (mem.); *Kasom v. City of Sterling Heights,* 600 F.Supp. 1555 (E.D.Mich.1985) (mem.), *aff' d,* 785 F.2d 308 (6th Cir.1986); *J.P. Mascaro & Sons, Inc. v. Township of Bristol,* 497 F.Supp. 625 (E.D.Pa.1980); *Estey Corp. v. Matzke,* 431 F.Supp. 468 (N.D.Ill.1976) (mem.). Insofar as these cases involved violations of constitutional

### 1. *Recognition of the Tort*

The primary objective of the tort of interference with prospective business advantage or opportunity is the protection of legitimate and identifiable business expectancies.... Weighing against social and individual interests in protection of business expectancies and efforts to acquire property are the interests in legitimate business competition. That is, much of the common law is premised on the theory that competitors should have an opportunity to compete for business until such time as it is cemented by contract or agreement. Public and individual interests in free competition become particularly acute where a plaintiff anticipates, but is not yet assured, that a contractual or firm business relationship will materialize. Where the plaintiff's contractual relations are merely contemplated or potential, the public interest is best served by allowing any competitor the opportunity to divert those prospects to itself, *so long as the means used are not themselves improper.* Any contrary rule may tend to establish and perpetuate trade monopolies. As the "expectancy" becomes more remote or less firmly established, the interest in free competition among business persons becomes more compelling.

2 Joseph D. Zamore, *Business Torts* § 12.01[2], at 12–5 to 12–6 (1999) (footnotes omitted) (emphasis added).

The Restatement (Second) of Torts § 766B, at 20 (1979) defines the tort of "Intentional Interference with Prospective Contractual Relation" as follows:

One who intentionally and improperly interferes with another's prospective contractual relation (except to marry) is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

The Restatement also provides:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference[,] and

(g) the relations between the parties.

*Id.* § 767, at 25–26 (brackets added).

Based in part upon the foregoing, the following elements have evolved into the tort of intentional or tortious interference with prospective business advantage: (1) the existence of a valid business relationship *or* a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff;[40] (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages. *See Locricchio v. Legal Services Corp.*, 833 F.2d 1352, 1357 (9th Cir.1987); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir.1997), *cert. denied,* —— U.S. ——, 119

---

due process, equal protection, and/or statutory civil rights, they are inapposite.

**40.** "[T]here must be a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship. The prospective economic re-

lationship need not take the form of an offer but there must be specific facts proving the possibility of future association." *Locricchio v. Legal Services Corp.*, 833 F.2d 1352, 1357 (9th Cir. 1987).

S.Ct. 46, 142 L.Ed.2d 36 (1998); *see also* 2 *Business Torts, supra*, §§ 12.01[4]–12.03[6], at 12–11 to 12–46.

■ Here, with respect to the Big Island Contract, the trial court specifically found that STI had an economic relationship with DAGS of which Matsuo and Laupahoehoe were aware and that Laupahoehoe and Matsuo's conduct operated to hinder competition and to obtain an unfair advantage for Laupahoehoe.[41] Nevertheless, the trial court concluded that there was *insufficient* evidence to show that: (1) such conduct was designed to disrupt appellants' relationship with DAGS; (2) the relationship had the probability of ripening into a future economic benefit for STI; (3) STI would have been awarded the Big Island routes; and/or (4) STI was injured and suffered damages.

Appellants adduced evidence of damage to STI on the basis of gross lost profits which equaled the sum of lost contract revenues and charter revenues.[42] According to appellants, school bus operators commonly obtained charter revenue which equaled approximately forty percent of their contract revenue. Appellees, however, adduced evidence that charter revenue was not commonly obtained by school bus operators on the Big Island and that RHSB and STI's calculations were based solely on RHSB's financial figures on Oahu. Considering appellants' failure to establish a reasonable correlation between contract and charter revenues on the Big Island and considering that, without any charter revenue, STI would have suffered a loss ranging from $14,220 to $8,140 if awarded the Big Island contracts, we cannot hold that the trial court erred in concluding that STI suffered no appreciable amount of damage on the Big Island. Appellants' tortious interference claim with respect to STI therefore fails.

■ Presumably, because the trial court found that Central was not the alter ego of Double K, with respect to the Oahu Contract, the trial court's only COL on the present subject was that "the evidence is insufficient to establish ... that Defendants' conduct was designed to disrupt the relationship between DAGS and the Plaintiffs to the claim of tortious interference with prospective business advantage." Considering our holding, *supra*, that Central is the alter ego of Double K, creating Double K to bid on contracts and lease buses simultaneously in circumvention of Specification M, we hold that there was a basis for the trial court to review whether appellees' conduct was intended to disrupt the reasonable expectancy of future economic relationships of the finite number of bidders, namely RHSB, with DAGS. Appellants adduced evidence showing that DAGS customarily awarded the contract to the next lowest bidder without rebidding the contract and that, but for appellees' conduct, RHSB would have been awarded Group 4. Accordingly, we remand this claim to the circuit court for the entry of new findings and conclusions with respect to the Oahu Contract on all of the elements of tortious interference with prospective business advantage.[43]

■ We note, for purposes of guidance, that the standard for assessing an expert's assumptions when calculating lost profits is *reasonableness*. Here, appellees challenged several of appellants' expert's assumptions, including: the ten-year versus six-year con-

41. These findings are not challenged on appeal.

42. Charter revenue is obtained between 8:00 a.m. and 3:00 p.m., the time in which buses dedicated for school routes can be used by public and private schools and/or non-profit organizations for field trips or excursions. Mits Nakatsuka, a former DAGS officer of twenty-three years, testified that charter revenue correlates with contract revenue, constitutes a considerable amount of income for school bus operators, and serves as an incentive to obtain contracts.

43. We note that "[n]ominal damages may be awarded [for tortious interference with prospec-

tive business advantage] when the fact of damage is established but the extent of damage is not proven." 2 *Business Torts, supra*, § 12.03[6], at 12–44 (brackets added). Furthermore, "[p]unitive damages may be awarded where actual damage is established and actual malice—that is, ill-will, hatred or spite—is shown or where other outrageous or oppressive conduct by the wrongdoer is demonstrated." *Id.* § 12.03, at 12–45 to 12–46. Such an award is appropriate only so long as the "punitive damages award ... relate[s] to the wrongdoing within the court's jurisdiction, and the defendant ... receive[s] fair notice of the severity of the penalty." *Id.*

tract period (based upon two two-year extensions), the forty percent charter revenue on Oahu, the charter drivers and benefits costs (*i.e.*, appellants' projected 32.2% versus appellees' projected 47.3%), fuel and lubricants, repair and maintenance, and driver contact expenses. The test is not whether appellants have supported these assumptions to an absolute certainty. *See supra* note 32. The test is whether appellants have supported these assumptions with a *reasonable* estimate of damages, considering, *for example*, such evidence as: (1) Nakatsuka's testimony that charter revenue is a considerable or substantial percentage of contract revenue; (2) appellees' expert's testimony that Double K, T & N, and STI's actual driver-cost-to-total-revenue-ratio ranged from 34.9%, 30.8%, to 26.5% during the relevant time periods; (3) appellees' expert's testimony regarding RHSB's driver-cost-to-revenue-ratio on charters; and (4) Nakatsuka, Okano, Governs, and Koga's testimony that two two-year extensions are customarily granted.

2. *Conspiracy to Commit Tortious Interference with Prospective Business Advantage*

▮ Appellants also alleged that appellees engaged in a civil conspiracy to commit tortious interference with their prospective business advantage with DAGS. For similar reasons as those discussed in connection with their conspiracy to attempt to monopolize claim, appellants' civil conspiracy claim fails.[44]

▮ Although addressing the concept of conspiracy for purposes of the Sherman Act, the United States Supreme Court, in *Copperweld Corp.*, explained that "in reality a parent and a wholly owned subsidiary always have a 'unity of purpose or a common design.' They share a common purpose whether or not the parent keeps a tight rein over

the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests." *Copperweld Corp.*, 467 U.S. at 771–72, 104 S.Ct. 2731; *cf. Shared Communications Services of 1800–80 JFK Boulevard, Inc. v. Bell Atlantic Properties Inc.*, 692 A.2d 570, 572–74 (Pa.Super.1997), *appeal denied*, 555 Pa. 704, 723 A.2d 673 (1998) (although a parent corporation and its wholly owned subsidiary may constitute a plurality of actors under concepts of civil conspiracy, "[u]nder certain circumstances, the arrangement between a parent and its wholly owned subsidiary could be such that the two legal corporations are not truly separate and are essentially corporate alter egos." (citations omitted)). Although we do not adopt, wholesale, the principles enunciated in *Copperweld*, because the instant civil conspiracy claim is not premised upon the Sherman Act, we recognize that the "singular enterprise" principle can be applied on a case-by-case, factual basis.

▮ Insofar as we have affirmed the circuit court's FOFs and COLs with regard to appellants' claim of tortious interference in the Big Island Contract, we conclude that appellants' conspiracy claim in this regard also fails. With respect to the Oahu Contract, insofar as we have held above that Central is the alter ego of Double K, Central and Double K cannot conspire. *See Ulrich*, 35 Haw. at 167. Moreover, trial testimony was adduced showing that Laupahoehoe and Central were viewed as one and the same corporation. "[T]he mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy." *Island Tobacco Co.*, 63 Haw. at 308, 627 P.2d at 273; *Island Tobacco Co.*, 513 F.Supp. at 739 (internal quotation marks and citations omitted). We note that there was no evidence adduced showing that C.M. Holding

**44.** Civil conspiracy does not alone constitute a claim for relief. *See Weinberg v. Mauch*, 78 Hawai'i 40, 49, 890 P.2d 277, 286, *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995); *Ellis v. Crockett*, 51 Haw. 45, 57, 451 P.2d 814, 822–23 (1969); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 46, at 324 (5th ed.1984). Moreover, mere acquiescence or knowledge is insufficient to constitute a conspira-

cy, absent approval, cooperation, or agreement. *See Winslow v. Brown*, 125 Wis.2d 327, 371 N.W.2d 417, 419 (Ct.App.), *appeal denied*, 126 Wis.2d 518, 378 N.W.2d 291 (1985); *More v. Johnson*, 193 Colo. 489, 568 P.2d 437, 440 (Colo. 1977) ("[S]ilent knowledge of an unlawful act is insufficient to establish the requisite agreement.").

Corporation,[45] Laupahoehoe, and Central were incorporated for anything other than legitimate corporate purposes, such as allocation of resources and responsibilities. Insofar as Laupahoehoe and Central, without cooperation and agreement between them, might have acted at Matsuo's direction individually, the record supports the trial court's finding and conclusion that "[t]he evidence is insufficient to establish that any two or more of the Defendants engaged in concerted action to accomplish an unlawful objective." In this regard, the trial court's finding/conclusion is not clearly erroneous. Furthermore, insofar as Matsuo (1) was an officer of Laupahoehoe and Central during the relevant time period, (2) was a 94% owner of C.M. Holding Corporation, the parent of Laupahoehoe and Central, and (3) apparently maintained the same economic objective as Laupahoehoe and Central, we cannot say that the *circuit court's finding/conclusion in this regard is clearly erroneous.* Accordingly, the trial court's finding/conclusion is affirmed.

### E. *Punitive Damages*

Appellants contend that the trial court erred in refusing to award punitive damages. We agree in part.

As noted above, an award or denial of punitive damages is within the sound discretion of the trier of fact and will not be reversed absent a clear abuse of discretion. *See Ditto,* 86 Hawai'i at 91, 947 P.2d at 959. Whenever a court disregards rules or principles of law or practice to the substantial detriment of a party, it abuses its discretion. *See Ho,* 88 Hawai'i at 256, 965 P.2d at 798. Insofar as the trial court failed to enter sufficient findings regarding appellees' claim for tortious interference with prospective business advantage on Oahu, we hold that the trial court abused its discretion with respect to punitive damages. We vacate the trial court's findings and conclusions in this regard and remand with instructions to enter findings of fact and conclusions of law.

45. Additionally, we note that C.M. Holding Corporation is not named as a party in the instant action.

### IV. *CONCLUSION*

For the foregoing reasons, we vacate the judgment, entered May 18, 1995, and the findings of fact and conclusions of law, filed April 26, 1995, with respect to issues of: (1) alter ego regarding Central, Double K, Laupahoehoe, and T & N; (2) tortious interference with prospective business advantage against Matsuo, Laupahoehoe, Central, and Double K on the Oahu Contract; and (3) punitive damages regarding tortious interference against Matsuo, Laupahoehoe, Central, and Double K on the Oahu Contract. In this regard, we remand with instructions to enter new findings of fact and conclusions of law consistent with this opinion.

Albeit for somewhat different reasons, we affirm the judgment, entered May 18, 1995, and the findings of fact and conclusions of law, filed April 26, 1995, with respect to the issues of: (1) unfair competition against Matsuo, Laupahoehoe, Central, Double K, and T & N; (2) attempt to monopolize and conspiracy to monopolize against Matsuo, Laupahoehoe, Central, Double K, and T & N; (3) conspiracy in restraint of trade against Matsuo, Laupahoehoe, Central, Double K, and T & N; and (4) conspiracy to commit tortious interference with prospective business advantage against Matsuo, Laupahoehoe, Central, Double K, and T & N. We accordingly affirm the trial court's judgment, findings, and conclusions in all other respects.